ORAL ARGUMENT NOT YET SCHEDULED

**No. 26-5023**
**(Consolidated with Nos. 26-5047, 26-5049)**

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

UNITED STATES OF AMERICA, *ET AL.*,
Plaintiffs-Appellees-Cross-Appellants,

v.

GOOGLE LLC,
Defendant-Appellant-Cross-Appellee.

---

On Appeals from the United States District Court
for the District of Columbia, Nos. 20-cv-3010 & 20-cv-3715
Hon. Amit P. Mehta

---

### APPELLANT-CROSS-APPELLEE'S INITIAL PRINCIPAL BRIEF

---

Benjamin J. Horwich
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000

John E. Schmidtlein
Graham W. Safty
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000

Donald B. Verrilli, Jr.
Helen E. White
Kyle A. Schneider
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
 Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

Mark S. Popofsky
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4624

*Counsel for Appellant-Cross-Appellee Google LLC*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT**

I certify that the combined certificate as to parties, rulings, and related cases, and corporate disclosure statement filed on February 23, 2026, Document #2160428, remains accurate.

Dated:  May 22, 2026

/s/ Donald B. Verrilli, Jr.
Donald B. Verrilli, Jr.

**TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT .......................................i

GLOSSARY OF ABBREVIATIONS ...............................................................x

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION...............................................................6

STATEMENT OF ISSUES ...........................................................................6

STATUTORY PROVISION ..........................................................................7

STATEMENT OF THE CASE.......................................................................8

I.      Factual Background..........................................................................8

        A.      Google Search and General Search Engines............................8

        B.      Promotion and Distribution of General Search Engines.......11

        C.      The Browser Agreements.....................................................15

                1.      The Apple Agreement................................................15

                2.      The Mozilla Agreement.............................................19

        D.      The Android Agreements.....................................................20

II.     Procedural Background ...................................................................21

        A.      Liability Proceedings...........................................................21

        B.      Remedies Proceedings.........................................................24

SUMMARY OF ARGUMENT ....................................................................28

STANDARD OF REVIEW .........................................................................34

ARGUMENT .............................................................................................34

I.      The District Court's Liability Determination Reflects Multiple, Independent Errors of Law ............................................................35

        A.      The District Court Erred in Holding that Google Engaged in Exclusionary Conduct ..................................................38

                1.      The District Court Used the Wrong Legal Standard for Identifying Exclusionary Conduct ............................40

**TABLE OF CONTENTS**
**(continued)**

**Page**

2.     Under the Correct Legal Standard, the Browser Agreements Reflected Competition on the Merits, Not Exclusion, Requiring Judgment for Google ..............................44

    a.     The Browser Agreements Were Lawful Competition on the Merits..............................................44

    b.     Google Never Prevented a Browser-Maker from Choosing a Rival's Offer that It Preferred ....................54

3.     The Browser Agreements Were Not Exclusive Dealing Agreements in the First Place, Independently Requiring Judgment for Google..............................................68

4.     The Android Agreements Cannot Alone Sustain Liability for Monopolization .................................................74

B.     The District Court's Finding of Monopoly Power Rests on the Legal Error of Ignoring Competitive Constraints on Google, Independently Requiring Judgment for Google.................................77

1.     Market Definition Requires Attention to "Commercial Realities" and What Products Are "Reasonably Interchangeable" .......................................................77

2.     The District Court's Own Findings Required Including General Search Engines and Specialized Vertical Providers in the Relevant Markets............................................78

3.     The District Court's Basis for Separating General Search Engines and Specialized Vertical Providers Was Legally Unsound .....................................................80

4.     Correcting the District Court's Erroneous Market Definition Requires Judgment for Google..............................84

II.     The District Court Abused Its Remedial Discretion by Failing to Apply the Correct Legal Standards ................................................85

A.     Antitrust Remedies Must Be Tailored to the Causal Connection Between the Defendant's Anticompetitive Conduct and Its Market Position ...............................................85

## TABLE OF CONTENTS
### (continued)

**Page**

B.   The District Court Never Made the Findings Legally Required to Support the Heightened Remedies of Data-Transfer and Syndication ................................................................................88

C.   Even If Data-Transfer and Syndication Were Proper Remedies, No Legal Basis Existed for Extending Them to Companies Offering GenAI Products ................................................................95

CONCLUSION ......................................................................................99

CERTIFICATE OF COMPLIANCE ................................................................100

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AD/SAT, Division of Skylight, Inc.* v. *Associated Press*,
  181 F.3d 216 (2d Cir. 1999) ................................................................81

*Aerotec International, Inc.* v. *Honeywell International, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ............................................................72

*Atlantic Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328 (1990) ......................91

*Babb* v. *Wilkie*, 589 U.S. 399 (2020) ................................................................86

*Barry Wright Corp.* v. *ITT Grinnell Corp.*,
  724 F.2d 227 (1st Cir. 1983) .........................................................72, 76

*Berkey Photo, Inc.* v. *Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ................................................................51

*Brown Shoe Co.* v. *United States*, 370 U.S. 294 (1962) ...........................................82

*Brown* v. *Plata*, 563 U.S. 493 (2011) ................................................................86

*Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U.S. 104 (1986) ......................50, 53

*Caribbean Broad. Sys., Ltd.* v. *Cable & Wireless PLC*,
  148 F.3d 1080 (D.C. Cir. 1998) ..........................................................60

*Chase Manufacturing, Inc.* v. *Johns Manville Corp.*,
  84 F.4th 1157 (10th Cir. 2023) ...........................................................59

*City of Mt. Pleasant* v. *Associated Electric Cooperative*,
  838 F.2d 268 (8th Cir. 1988) ..............................................................48

*City of Oakland* v. *Oakland Raiders*, 20 F.4th 441 (9th Cir. 2021) ......................43

*Concord Boat Corp.* v. *Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ............................................................91

\* *Authorities upon which we chiefly rely are marked with asterisks.*

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Connell Construction Co.* v. *Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616 (1975)........................................................52

*DSM Desotech Inc.* v. *3D Systems Corp.*, 749 F.3d 1332 (Fed. Cir. 2014)..................................................81

\* *Eastman Kodak Co.* v. *Image Technical Services, Inc.*, 504 U.S. 451 (1992)..........................................57, 77, 78, 80

\* *Eisai, Inc.* v. *Sanofi Aventis U.S., LLC*, 821 F.3d 394 (3d Cir. 2016) ..............................................58, 60

\* *In re EpiPen Marketing, Sales Practices and Antitrust Litigation*, 44 F.4th 959 (10th Cir. 2022) ...............................49, 50, 60, 68, 76

*Federal Trade Commission* v. *Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008).............................................82

*Geneva Pharmaceuticals Technology Corp.* v. *Barr Laboratories Inc.*, 386 F.3d 485 (2d Cir. 2004) ........................................78, 80

*Jeffries* v. *Barr*, 965 F.3d 843 (D.C. Cir. 2020)..........................................34

*Lorain Journal Co.* v. *United States*, 342 U.S. 143 (1951) ...............................58, 59

*Malheur Forest Fairness Coalition* v. *Iron Triangle, LLC*, 164 F.4th 710 (9th Cir. 2026) ...........................................63

\* *Massachusetts* v. *Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004)....25, 27, 34, 87, ..................................................................................88, 89, 95, 97

*McWane, Inc.* v. *Federal Trade Commission*, 783 F.3d 814 (11th Cir. 2015) ..........................................59

*Menasha Corp.* v. *News America Marketing In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) ..........................................61

*National Society of Professional Engineers* v. *United States*, 435 U.S. 679 (1978)..................................................38

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

\* *National Collegiate Athletic Association* v. *Alston*,
   594 U.S. 69 (2021)......................................................87, 88, 94, 98

\* *New York* v. *Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023).......................4, 70

*New York* v. *Microsoft Corp.*,
   224 F. Supp. 2d 76 (D.D.C. 2002)........................................................96

*NicSand, Inc.* v. *3M Co.*, 507 F.3d 442 (6th Cir. 2007)...........................................63

\* *Novell, Inc.* v. *Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013)................39, 48, 51

\* *Ohio* v. *American Express Co.*, 585 U.S. 529 (2018)...........................78, 80, 81, 83

*OJ Commerce, LLC* v. *KidKraft, Inc.*,
   34 F.4th 1232 (11th Cir. 2022) ........................................................76

*Olympia Equipment Leasing Co.* v. *Western Union Telegraph Co.*,
   797 F.2d 370 (7th Cir. 1986) ........................................................51

\* *Pacific Bell Telephone Co.* v. *linkLine Communications, Inc.*,
   555 U.S. 438 (2009)....................................................1, 43, 53, 65, 71

\* *Rambus* v. *Federal Trade Commission*,
   522 F.3d 456 (D.C. Cir. 2008)..........................................3, 4, 55, 56

*Reifert* v. *South Central Wisconsin MLS Corp.*,
   450 F.3d 312 (7th Cir. 2006) ........................................................82

*Rothery Storage & Van Co.* v. *Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986)........................................................82

*Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447 (1993)....................................42

*Stop & Shop Supermarket Co.* v. *Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004)........................................................75

*Town of Concord, Massachusetts* v. *Boston Edison Co.*,
   915 F.2d 17 (1st Cir. 1990).......................................................50, 65

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States* v. *Aluminum Company of America*,
148 F.2d 416 (2d Cir. 1945) ...............................................................1, 49

\* *United States* v. *Continental Can Co.*, 378 U.S. 441 (1964).............................80, 81

*United States* v. *Dentsply International, Inc.*,
399 F.3d 181 (3d Cir. 2005) ....................................................................59

*United States* v. *Glaxo Group Ltd.*, 410 U.S. 52 (1973)...........................................86

*United States* v. *Grinnell Corp.*, 384 U.S. 563 (1966) ...........................................35

\* *United States* v. *Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001).........................1, 3, 4, 5, 23, 29, 30, 33-46, 50-52,
.................................................................... 61, 75-79, 83, 85-88, 91, 96-97

\* *Verizon Communications, Inc.* v. *Law Offices of
Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ....................... 35, 51, 52, 75, 86, 87

*Viamedia, Inc.* v. *Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ..................................................................43

*Walker Process Equipment, Inc.* v. *Food Machinery & Chemical
Corp.*, 382 U.S. 172 (1965) ..............................................................35, 36, 77

*Weyerhaeuser, Co.* v. *Ross-Simmons Hardwood Lumber Co.*,
549 U.S. 312 (2007).........................................................................38, 42, 53

\* *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ......36, 57, 59, 61, 69


**STATUTES AND RULE**

\* 15 U.S.C. § 2 ................................................................................................7

28 U.S.C. § 1291 ............................................................................................6

28 U.S.C. § 1331 ............................................................................................6

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

28 U.S.C. § 1337 ...................................................................................................6

28 U.S.C. § 1345 ...................................................................................................6

Fed. R. Civ. P. 52(a)...........................................................................................34

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*
   (updated May 2026)...............................................................................36, 69, 91

Brief for the United States as Amicus Curiae, *Duke Energy Carolinas,
   LLC* v. *NTE Carolinas II, LLC*, No. 24-917 (U.S. Dec. 1, 2025) ................44, 52

Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging
   Consummated Mergers Under Section 2*, CPI North America
   Column (May 2020)......................................................................................41

## GLOSSARY OF ABBREVIATIONS

The following abbreviated terms are used in this brief:

GenAI       Generative Artificial Intelligence

GSE         General Search Engine

ISA         Internet Services Agreement between Apple and Google

MADA        Mobile Application Distribution Agreement

OEM         Original Equipment Manufacturer

SVP         Specialized Vertical Provider

**INTRODUCTION**

The antitrust laws promote vigorous economic competition among rival firms. They do so because that is the surest way for American consumers to obtain the best products and services at the best price. Competition produces winners and losers. And sometimes a firm—by innovating better, investing more, or just working harder—will leave its rivals behind. When that happens, it may be tempting to wield the antitrust laws like a machete to cut a dominant competitor down to size. But as Learned Hand long ago warned, "[t]he successful competitor, having been urged to compete, must not be turned upon when he wins." *United States* v. *Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945).

To ensure that antitrust law is not misused to punish—and therefore deter—vigorous competition, the Supreme Court and this Court have established guardrails to separate lawful conduct that harms competitors (which competition naturally does) from unlawful conduct that harms the competitive process itself. *United States* v. *Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc). To achieve their purpose, the guardrails must take the form of "clear rules" that enable firms to compete vigorously without fear of triggering massive liability under contentless standards that provide no "guidance." *Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*, 555 U.S. 438, 452-53 (2009).

The district court's ruling against Google crashed through those guardrails. The court's own findings establish that Google's conduct was lawful. It developed a superior search engine through hard work, bold innovation, and shrewd business decisions. JA__[Liability.Op.2]*.[1] By 2009—well before any conduct challenged here—Google handled 80% of U.S. users' search queries, JA__[Liability.Op.13]*, and was prescient in seeing first that "the future of search was on mobile [devices]," leaving rivals scrambling "to catch up—unsuccessfully—ever since," JA__[Liability.Op.200]*. No surprise, then, that after Apple and Mozilla each independently chose to design its web browser to have a single out-of-the-box default search engine, each firm also selected Google for that position. As the district court found, Apple and Mozilla "value [Google's] quality, and…its search engine provides the best bet for monetizing queries." JA__[Liability.Op.199]*. By contrast, Apple concluded that the search engine of Google's principal competitor, Microsoft, was "inferior," JA__[Liability.Op.113]*, and "horrible at monetizing advertising." JA__[Liability.Op.112]*. So Apple and Mozilla sensibly chose Google because it gave their users the best experience and they stood to earn the most by sharing in Google's advertising revenues. That is what competition on the merits looks like.

---

[1] Orders of the district court are indicated by an asterisk.

The district court nonetheless reached the remarkable conclusion that Google's success in outcompeting its rivals for the out-of-the-box default placement violated Section 2 of the Sherman Act. That is as basic an error of antitrust law as a court can make. *Microsoft*, 253 F.3d at 58, 68 (the antitrust laws do not condemn "growth or development as a consequence of a superior product [or] business acumen" nor do they "condemn even a monopolist for offering its product at an attractive price" (citation omitted)). Whether or not Google has monopoly power (it does not, *see infra*, pp. 77-85), Google did nothing that "harm[ed] the competitive *process*." *Microsoft*, 253 F.3d at 58. It did not impede its rivals' opportunity to make—or Apple's and Mozilla's ability to choose—a better offer. Indeed, there is no finding—or even any evidence—that Google's customers would have chosen a rival, even in the absence of the challenged agreements. *See Rambus* v. *FTC*, 522 F.3d 456, 466-67 (D.C. Cir. 2008). Google just prevailed in the marketplace fair and square.

The district court thought that the "key question" for assessing the lawfulness of Google's agreements was whether they "reasonably appear capable of significantly contributing to maintaining Google's monopoly power." JA__[Liability.Op.216]*. But that was not the "key question"—it was the wrong question. Conduct does not violate Section 2 merely because it "reasonably appear[s] capable" of maintaining a defendant's market position. The very actions

the antitrust laws encourage—offering a better product or a better price—can produce precisely that result.  Section 2 condemns only *exclusionary* conduct—that is, conduct that distorts or disables the competitive process by (for example) significantly interfering with customers' ability to obtain and choose rivals that offer a better product or a better price.  *Microsoft*, 253 F.3d at 59; *Rambus*, 522 F.3d at 466-67.  But offering a better product at a better price is not exclusionary—full stop.  *Microsoft*, 253 F.3d at 58.[2]

Labeling Google's browser agreements "exclusive dealing," as the district court did, does not make them exclusionary.  Indeed, the agreements were not exclusive deals at all.  Apple and Mozilla remained free to distribute and promote rival search engines, and they did so.  Contracts that "leave[]" customers "entirely free to" deal with "competitors" cannot be condemned as exclusionary exclusive deals.  *New York* v. *Meta Platforms, Inc.*, 66 F.4th 288, 304 (D.C. Cir. 2023).  And even accepting the court's mistaken premise that the agreements were exclusive deals, they reflect no exclusionary conduct on Google's part.  After all, it was

---

[2] As this Court made clear in *Microsoft*, the "reasonably appear[s] capable" standard is one used to assess causation, not whether conduct is exclusionary. Only after finding conduct was exclusionary does a court applying Section 2 consider whether such conduct "reasonably appear[s] capable" of maintaining a defendant's monopoly to assess the "causal link between [the] anticompetitive conduct" "and the maintenance of…monopoly," *Microsoft*, 253 F.3d at 78-80. *See infra*, pp. 40-44.

Apple and Mozilla—not Google—that chose for their own sound business reasons to design web browsers with a single out-of-the-box default search engine. Any supposed "exclusivity" was thus entirely attributable to their independent choices. Nothing in the antitrust laws justifies imposing liability on Google for simply making an offer that best matched their specifications.

The district court's remedial order is just as misconceived. Despite making no finding that Google's rivals would have done any better without the contractual terms it found unlawful, the court went well beyond enjoining those terms. It required Google to transfer its data and give its search engine results to other companies so that they can copy Google—mandating a form of ersatz competition that would never have arisen in the real world and would do nothing to spur real innovation from Google's rivals. The court even extended those advantages to generative artificial intelligence ("GenAI") products like ChatGPT that could not have been affected by Google's conduct because they *did not even exist* during the relevant period, and that are already succeeding as wildly as any technology in human history without any need to free-ride on Google's success. JA__[Remedies.Op.40-41]*. All those remedies must be reversed because the district court did not make—and could not have made—the foundational finding of "a sufficient causal connection between [the defendant's] anticompetitive conduct and its dominant position in the [relevant] market." *Microsoft*, 253 F.3d at 106.

At bottom, the district court's failure to heed the elemental distinction in antitrust law between conduct that harms competitors and conduct that harms the competitive process produced exactly the result that the law is designed to prevent. This is truly the case of a successful competitor being turned upon because it has won. The district court's judgment should be reversed in its entirety.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1337 & 1345. It entered judgment on December 5, 2025, and by order dated December 18, 2025, extended the time to appeal in *Colorado* v. *Google LLC* until February 3, 2026. JA__[U.S.Dkt.1466]*. Google timely appealed. JA__[U.S.Dkt.1472]; JA__[Colorado.Dkt.174]. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the district court erred in holding that Google engaged in exclusionary conduct, where Google (a) offered the best product and the best price for the out-of-the-box default placement that browser-makers unilaterally designed into their products and (b) otherwise did nothing that made a browser-maker give up a preference for a rival's offer.

2. Whether the district court erred in treating Google's browser agreements as exclusive dealing contracts, where those agreements permitted

browser-makers to distribute and promote other general search engines ("GSEs"), and the browser-makers did so.

3.      Whether the district court erred in placing specialized vertical providers ("SVPs") such as Amazon and Expedia outside the relevant market, where GSEs and SVPs can be used for the same commercial purposes and competition from SVPs has forced Google to innovate to make its GSE more attractive.

4.      Whether the district court abused its discretion by ordering Google to aid its rivals by transferring data and syndicating its results, where (a) there was no finding and no evidence as to how Google's challenged conduct affected rivals' market positions, and (b) the court made numerous findings suggesting that market outcomes would have been the same regardless of Google's challenged conduct.

5.      Whether the district court abused its discretion by forcing Google to extend that same aid to makers of new GenAI products that did not exist at the time of Google's challenged conduct, are not alleged to be in the relevant market, and are thriving on their own.

## STATUTORY PROVISION

Sherman Act § 2, 15 U.S.C. § 2, provides in relevant part:  "Every person who shall monopolize…any part of the trade or commerce among the several States…shall be deemed guilty of a felony…."

**STATEMENT OF THE CASE**

## I.    Factual Background

### A.    Google Search and General Search Engines

**1.**    Every day, Google Search answers billions of queries in nearly 150 languages, free of charge.  Google Search is a "general" search engine because it attempts to answer all types of queries.  JA__[Liability.Op.17]*.  GSEs "use powerful algorithms to…retrieve, rank, and display the websites that provide the exact information the user seeks at that very moment."  JA__[Liability.Op.1]*.  Microsoft's Bing, Yahoo!, and DuckDuckGo are also GSEs.

Google "has long been the best search engine, particularly on mobile devices."  JA__[Liability.Op.199]*.  Consider the period long before the earliest anticompetitive effects claimed by Plaintiffs.[3]  In 2009, "80% of all general search queries, whether entered on a desktop computer or mobile device, flowed through Google."  JA__[Liability.Op.13]*.  When these cases were brought in 2020, that share was 89.2%.  JA__[Liability.Op.13]*.  Google remains "widely recognized as the best GSE available in the United States."  JA__[Liability.Op.46]*.

"Google's superior product quality rests in part on its numerous innovations."  JA__[Liability.Op.46]*.  Google "hired thousands of highly skilled

---

[3] *See* JA__[Liab.Tr.6037-6039] (Whinston) (U.S. Plaintiffs' expert was "asked…to look at the time period beginning in 2014"); JA__[Liab.Tr.7243-7244] (Baker) (Colorado Plaintiffs' expert "only looked at 2016 to the present").

engineers, innovated consistently, and made shrewd business decisions."
JA__[Liability.Op.2]*.  Google "foresaw that the future of search was on mobile,"
while its rival Microsoft "was slow to recognize" that dynamic and thus "has been
trying to catch up—unsuccessfully—ever since."  JA__[Liability.Op.200]*; *see*
JA__[Remedies.Op.77]* ("Microsoft 'miss[ed]' the mobile revolution").  "Nor has
Google sat still; it has continued to innovate."  JA__[Liability.Op.199]*.  "The
result" of Google's investment and acumen "is the industry's highest quality search
engine, which has earned Google the trust of hundreds of millions of daily users."
JA__[Liability.Op.2]*.  Indeed, one of the most popular queries on Microsoft's
Bing is "Google.com."  JA__[Liab.Tr.2745] (Parakhin); *see*
JA__[Liability.Op.160]*.

**2.**    Although GSEs *respond* to all kinds of queries, GSEs *earn revenue*
only by including paid advertising in responding to commercial queries—known as
"monetizing" a query.  JA__[Liability.Op.18, 23]*.  Google "serve[s] ads…only in
response to queries that convey a 'commercial intent,'" JA__[Liability.Op.59]*—
*e.g.*, "budget-friendly Chicago hotel" or "best blender."  Only 20% of queries on
Google are commercial; the other 80% seek "information that the GSE does not
attempt to monetize by delivering a search advertisement"—*e.g.*, "how to perform
CPR."  JA__[Liability.Op.17]*.

The opportunity to respond to—and monetize—commercial queries is valuable; in 2021, Google made $146 billion in worldwide revenue from paid advertisements. JA__[Liability.Op.2]*. Google is notably more efficient than its competitors at monetizing commercial queries. *See* JA__[Liability.Op.46]*.

Google competes for commercial queries against SVPs as well as other GSEs like Microsoft Bing. SVPs "are platforms that respond to queries centered on a particular subject matter." JA__[Liability.Op.50]*. Examples of SVPs include Amazon and eBay (a wide range of commercial products), Booking.com and Expedia (travel), and Yelp (restaurants and hotels). JA__[Liability.Op.50]*.

"No one disputes that an SVP can serve the same purpose as a GSE for an individual query on a particular subject matter." JA__[Liability.Op.147]*. "A user can, for example, use either Google or OpenTable to find a nearby Japanese restaurant, or turn to Google or Amazon to shop for a blender." JA__[Liability.Op.147]*. Thus, "GSEs compete against SVPs for certain commercial queries in vertical offerings, such as travel and shopping." JA__[Liability.Op.52]*.

Google "views competition from SVPs as 'intense for commercial clicks.'" JA__[Liability.Op.53]*. Google accordingly "developed verticals like shopping, flights, and hotels in part to provide users with topic-specific results much like SVPs." JA__[Liability.Op.147]*. Google developed "product listing ads," which

- 10 -

are shopping ads with pictures displayed in response to queries for tangible goods, "both to meet…consumer need and to compete with Amazon's retail offerings." JA__[Liability.Op.59-61]*.  Most fundamentally, Google answers *all* queries as a strategy to compete against SVPs, "seek[ing] to attract users on the promise that it will accurately and efficiently answer any quer[ies]," JA__[Liability.Op.142]*.

## B.    Promotion and Distribution of General Search Engines

Getting people to use a GSE is the first step to monetizing queries.  Anyone using a web browser can type a GSE's address (*e.g.*, "bing.com") to navigate to that GSE's website and enter a query.  JA__[Liability.Op.24]*.  On mobile devices, users can also use "search applications," such as the Google app or Bing app.  JA__[Liability.Op.31]*.  And on "Android devices" there is a "search widget (prominently displayed at the center of the device's home screen)." JA__[Liability.Op.24]*.

Browser-makers also integrate search capabilities into their software's navigation bar.  JA__[Liability.Op.24-25]*.  "On Apple products," a GSE is accessible through "the integrated search bar in the Safari browser." JA__[Liability.Op.24]*.  There is a single box for search queries and web addresses in Google's Chrome browser.  JA__[Liability.Op.24]*.  "[O]n Windows desktop computers, the default access point is the integrated search bar in the

[Microsoft] Edge browser." JA__[Liability.Op.24]*. Examples from Mozilla's Firefox, Google's Chrome, and Microsoft's Edge are depicted below.



Because users expect these browser-based search functions to work "out-of-the-box" (*i.e.*, without user set-up), a "longstanding industry practice [is] preloading a browser with a default GSE." JA__[Liability.Op.248]*. "Indeed, all browsers in the United States are so designed." JA__[Liability.Op.248-49]*. Browser-makers that also offer GSEs—*e.g.*, Microsoft, DuckDuckGo, and Google—promote their own GSE by setting it as their browser's out-of-the-box default. *See* JA__[Liability.Op.24]*. Users can choose a GSE by choosing a browser. For example, Windows PCs come preinstalled with only Microsoft's Edge—which defaults to Microsoft's Bing—but despite Microsoft's advantage, "Google's search share on Windows devices is 80%" in large part because users

download Google Chrome for its superior functionality, including its integrated Google Search default. JA__[Liability.Op.32]*.

Browser-makers that lack their own GSEs—*e.g.*, Apple and Mozilla—market the rights to be the out-of-the-box default as a form of promotional placement that enhances the desirability of their browser. JA__[Liability.Op.25]*. But "defaults" are merely *preconfigured* settings; on "all major browsers, users can navigate to the browser's settings and change the default to their preferred GSE." JA__[Liability.Op.25]*. Browser-makers also sell other promotional placement to GSEs (and SVPs), such as pre-loaded bookmarks that give users one-click access to those sites. JA__[Liability.Op.32]*. Here is an example from Apple's Safari browser:



*See* JA__[DXD-37.047].

All browser-makers have historically designed their browser to have the same out-of-the-box default GSE on *all* mobile devices and computers alike, in *all* browsing modes (*e.g.*, "normal" versus "private" mode). As a top Apple executive explained, Apple "buil[t] the Safari browser to have a single default search engine out-of-the-box." JA__[Liab.Tr.2623-2624] (Cue). This was a "product design decision that Apple carefully considered." JA__[Liab.Tr.2623-2624] (Cue). Apple did so on "all devices"—phones, tablets, and computers—because "from an Apple perspective, why would we give an inferior experience on a Mac versus a phone." JA__[Liab.Tr.2476-2479] (Cue).

- 14 -

## C.    The Browser Agreements

A browser-maker that lacks its own GSE has query traffic that it cannot monetize, while a GSE can monetize only the queries it receives.  Like many businesses in similar situations, neither can profit alone, but each has something the other needs.  So they strike a deal:  The browser-maker sends query traffic to a GSE via an out-of-the-box default, the GSE monetizes the queries, and they share the resulting revenue.  JA__[Liability.Op.2, 59, 102]*.

Google's two most significant browser agreements are with Apple (for its Safari browser) and Mozilla (for its Firefox browser).  "Google's partners value its quality, and they continue to select Google as the default because its search engine provides the best bet for monetizing queries."  JA__[Liability.Op.199]*.

### 1.    The Apple Agreement

In 2002, Apple and Google's first search-related agreement (the "Internet Services Agreement" ("ISA")) provided that Apple would make Google Search available on Safari in exchange for a license to use Google Search. JA__[Liability.Op.108]* (citing JA__/JX1 (2002 ISA)).  Apple did not promise Google out-of-the-box default status, and Google did not share any of the advertising revenue it earned.  JA__[Liability.Op.108]*.  In 2005, Apple and Google agreed that Apple would make Google the out-of-the-box default GSE for

- 15 -

Safari, in exchange for a share of the revenue from queries made through that default.  JA__[Liability.Op.109]*.

Google and Apple entered into the current ISA in 2016 and renewed it in 2021 (through 2026).  JA__[Liability.Op.101, 110]*.  Under its terms, Apple sets Google as the "Default" GSE on both desktop and mobile versions of Safari.  JA__[JX33.793].  The ISA defines "Default" as the GSE that "will automatically be used for responding to Search Queries initiated from the Web Browser software, unless the End User selects a different third-party search service."  JA__[JX33.793].  In exchange, Google pays Apple a percentage share of the revenue from queries made through that default setting, JA__[JX33.797]—a very large payment in absolute terms, but one commensurate with the very large number of queries Apple sends to Google, and the very large amount of money Google makes from monetizing those queries.

Apple chose Google Search as the default GSE because Apple determined that Google had the best quality product for Apple's users and would generate the most revenue for Apple.  The two go hand in hand.  Apple had an incentive to put the GSE that users preferred in the default position because that would generate the most queries through the default and thus generate more revenue to share with Apple.  Conversely, as Apple's executive explained, "[i]f you have an inferior

- 16 -

search engine, customers wouldn't use it, and so, therefore, I don't know how you could monetize it well."  JA__[Liab.Tr.2511-2512] (Cue).

Google was a "no brainer" because it had "the best search engine." JA__[Liability.Op.113]* (quoting JA__/Liab.Tr.2528 (Cue)); *see* JA__[Liability.Op.115]* (citing JA__/UPX260.681) (describing 2021 Apple study finding Google Search "superior to Bing on all search access points").  As Apple's executive explained, "we have to pick what's best for our customers, and today, that is still Google."  JA__[Remedies.Tr.3829-3830] (Cue).

By contrast, "Bing's inferior quality" made choosing Microsoft a "business risk."  JA__[Liability.Op.113] (quoting JA__/Liab.Tr.2519 (Cue)).  Even though Microsoft offered to pay Apple 100% of search advertising revenues generated if Bing was made the default, Apple believed that it would still earn less because users would abandon the Bing default in favor of Google.  Given users' strong preference for Google, there was "'no price that Microsoft could ever offer [Apple]'" to make Bing the default that would be more profitable for Apple. JA__[Liability.Op.113]* (quoting JA__/Liab.Tr.2519) (Cue)).

Choosing Google would also be more profitable for Apple because Google's superior advertising technology would earn more revenue per query.  Apple viewed Google Search as a "sure thing" because "they know how to advertise, and

- 17 -

they're monetizing really well." JA__[Liability.Op.113]*.  By contrast, Apple saw Bing was "horrible at monetizing advertising."  JA__[Liability.Op.112]*.

Although the ISA has set Google Search as the out-of-the-box default, it does not restrain Apple from distributing or promoting other GSEs.  To the contrary, Apple can (and does) preload rival GSEs via bookmarks on the Safari homepage, selling that placement to Bing and Yahoo! in exchange for a revenue share.  *See* JA__[Liability.Op.32]*.  And the ISA has specified only the out-of-the-box Safari default; Apple can (and does) make other GSEs accessible through the search bar and makes them the default if users select them, *see* JA__[Liability.Op.25, 209]*, as shown here.

  

JA__[DXD-06.001].

### 2. The Mozilla Agreement

Mozilla and Google similarly agreed to set Google Search as the out-of-the-box default GSE for the Firefox browser's integrated search bar in exchange for Google sharing advertising revenue it received through that default position. JA__[Liability.Op.115]*.  Mozilla's former CEO testified that Mozilla selected Google as the default GSE between 2004 and 2014 because "Google was way ahead" of the competition and had no issue with Mozilla's principle that it was "not doing anything exclusive and…would honor user choice."  JA__[Dkt.757-2.48-52] (M. Baker).

In 2014, Yahoo! and Mozilla agreed to set Yahoo! as the default for a three-year period.  Mozilla "found almost immediately…that [its] users did not like the Yahoo! Search experience," and "[s]earch volumes declined" as "people shifted away from the default" to find Google through other means. JA__[Remedies.Tr.3144] (Muhlheim).  Yahoo! reacted by "increas[ing] the number of ads it placed" to generate revenue, "degrading the user experience and ultimately resulting in Mozilla changing the default back to Google." JA__[Liability.Op.116]*; *see* JA__[Dkt.757-2.80] (M. Baker) (Mozilla reverted the default to Google "[b]ecause our users made it clear that they look for and want and expect Google").

Since then, Mozilla has periodically assessed whether to switch Firefox's out-of-the-box default away from Google, particularly "when its agreements come up for renewal." JA__[Liability.Op.117]*. Its experiments revealed that, within days, a substantial number of users abandoned other out-of-the-box default GSEs in favor of Google. JA__[Liability.Op.117-18]*. "Mozilla's takeaway was that switching the Firefox default to Bing would result in missing revenue targets." JA__[Liability.Op.117]*.

### D.     The Android Agreements

Google also obtains queries through search access points governed by its agreements with original equipment manufacturers ("OEMs") of mobile devices running the Android operating system and with wireless carriers distributing Android devices. JA__[Liability.Op.25]*.

Google has entered into a Mobile Application Distribution Agreement ("MADA") with each Android OEM (*e.g.*, Motorola and Samsung). JA__[Liability.Op.118]*. The MADA is a device-by-device license for mobile applications Google developed for Android devices. JA__[Liability.Op.118]*. Under a MADA, an OEM pays no fee for a license to certain Google applications and it agrees to preload and place certain Google applications, including Google Chrome and the Google Search Widget. JA__[Liability.Op.118-19]*.

- 20 -

Google has also entered into Revenue Share Agreements with both wireless carriers and OEMs.  JA__[Liability.Op.123]*.  These agreements provide for Google to pay for the promotion of Google Search and/or Chrome on the device. JA__[Liability.Op.123]*; *see* JA__[Liability.Op.124]*.

## II.    Procedural Background

These consolidated appeals arise from two cases consolidated below, JA__[Colorado.Dkt.67]*, one filed by the United States and 11 States and one by a group of 38 States (collectively, "Plaintiffs").  As relevant here, Plaintiffs alleged that Google held a monopoly in general search services, search advertising, and general search text advertising, and unlawfully maintained those monopolies in violation of Section 2 "by entering into exclusive agreements to secure default distribution" of Google Search.  JA__[Liability.Op.5]*.  Summary judgment was granted for Google as to certain theories that Plaintiffs no longer press. JA__[U.S.Dkt.728]*.  The cases were bifurcated for trial as to liability and remedies.  JA__[Dkt.264]*.

### A.    Liability Proceedings

Following a liability trial in 2023, the district court issued findings of fact and conclusions of law.  JA__[Liability.Op.1]*.

The district court identified two relevant antitrust product markets in which Google possessed monopoly power.  *First*, the court accepted Plaintiffs' proposed

"product market for general search services." JA__[Liability.Op.136]*. The court acknowledged that SVPs "respond to queries" and are particularly useful for answering certain kinds of monetizable commercial queries. JA__[Liability.Op.141]*. But it placed such products outside the market because they used different "business models" to appeal to users. JA__[Liability.Op.142]*. *Second*, the court defined a General Search Text Ads market as "text ads appearing on a GSE's" results page. JA__[Liability.Op.165, 185-90]*.

Turning to whether Google unlawfully maintained those monopolies, the court treated the "case as one about exclusive dealing," in line with how Plaintiffs had "framed this case" from the "outset." JA__[Liability.Op.203]*.[4] The court held that the browser agreements were "exclusive," even though they included "no express exclusivity provision," JA__[Liability.Op.207]*, "[u]sers are free to navigate to Google's rivals through non-default search access points," JA__[Liability.Op.209]*, and browser-makers were free to distribute and promote rival GSEs. JA__[Liability.Op.203]*. The court also deemed the Android

---

[4] "[F]or the first time post-trial," Plaintiffs "contend[ed] that the court should eschew considering [Google's] agreements through the lens of exclusivity, which they now deem 'too narrow,' but instead should 'opt[] for the general Section 2 standard.'" JA__[Liability.Op.203]* (quoting JA__/Plaintiffs'.PCOL.Dkt.838.13-16). The district court rejected this "[u]nexpected[]" and "dramatic post-trial shift." JA__[Liability.Op.203]*.

agreements exclusive (a conclusion that, as explained below, this Court need not address).

The court's conclusion that the agreements were exclusive did not end its inquiry because exclusive dealing, a "presumptively legitimate business practice," *Microsoft*, 253 F.3d at 69, is unlawful only if the plaintiff further "show[s] 'that the monopolist's conduct indeed has the requisite anticompetitive effect.'" JA__[Liability.Op.214-15]* (quoting *Microsoft*, 253 F.3d at 58-59).  The court held that, taken together, the browser agreements and Android agreements were "exclusionary"—*i.e.*, had the requisite anticompetitive effect.

The court found that browser-makers chose Google because it offered the best product at the best price for the out-of-the-box default they designed into their products.  JA__[Liability.Op.198-203]*.  And it made no finding that any browser-maker would have preferred a rival GSE for the out-of-the-box default without Google's agreements, let alone that Google forced any browser-maker to give up such a preference.  It nevertheless held that Google's browser agreements were anticompetitive because they "'reasonably appear[] capable of making a significant contribution to…maintaining monopoly power.'"  JA__[Liability.Op.215]* (quoting *Microsoft*, 253 F.3d at 79).

Accordingly, the court concluded that "Google is liable under Section 2 of the Sherman Act for unlawfully maintaining its monopoly in the market for general

search services." JA__[Liability.Op.257-58]*.  It incorporated its reasoning as to the General Search market to further conclude that Google unlawfully maintained a monopoly in the Search Text Advertising market.  *See* JA__[Liability.Op.258-65]*.

### B.     Remedies Proceedings

After additional discovery and briefing, the parties presented evidence at a remedies hearing in 2025.

**1.**     Google proposed remedies barring it from having promotional distribution agreements for Search that contained terms the district court had deemed impermissibly exclusive.  JA__[Remedies.Op.15-16]*.  Google proposed expressly permitting browser-makers to make another GSE the default for certain devices or access modes.  JA__[Remedies.Op.15-16]*.

But Google contended that remedies should stop short of affirmatively aiding rivals or hobbling Google.  Google explained that remedies designed to help competitors perform better were unsupportable because Plaintiffs never proved, and the court never found, that Google's rivals would have had any more success against Google's superior product in the absence of the challenged agreements.  Google also showed that barring it from competing with rivals to promote its GSE would hurt competition, its business partners, and users.

**2.**    The court acknowledged that "in calibrating the scope of a remedial decree," "[t]he relief granted should not 'exceed[] evidence of a causal connection' between the defendant's anticompetitive behavior and its dominant position in the relevant market."  JA__[Remedies.Op.63]* (quoting *Massachusetts* v. *Microsoft Corp.*, 373 F.3d 1199, 1234 (D.C. Cir. 2004) (en banc)).  But the court held that it was unnecessary to decide "how much additional scale or revenue Google received as a result of the exclusive agreements to treat them as fruits of the violation."  JA__[Remedies.Op.98]*.  Instead, it held the key remedies "question" was "how much confidence the court has in [its] assessment" from the liability stage "that Google's exclusive distribution agreements significantly contributed to the maintenance of its monopoly power."  JA__[Remedies.Op.77]*; *accord* JA__[Remedies.Op.73]*.  Opining that its "liability determination was supported by more than the barest of inferences," the court held it "[wa]s thus satisfied that its liability findings support…some of [Plaintiffs'] proposed behavioral remedies."  JA__[Remedies.Op.81-82]*.

On that basis, the court compelled Google to give its rivals benefits they never would have enjoyed absent Google's conduct.  JA__[Remedies.Op.128-86]*.  It ordered Google to make a one-time disclosure to so-called "Qualified Competitors" of Google's proprietary search index, "a database of publicly available web pages that can be returned in response to a user query," that is

- 25 -

"critical to returning high-quality search results." JA__[Remedies.Op.136-37]*. Developing that index required "billions of dollars" for "just the technical infrastructure." JA__[Liability.Op.21-22]*. The court also ordered Google to transfer to Qualified Competitors, on a rolling basis, "User-side Data" such as "the web link or vertical information the user clicks on, how long a user hovers over a link, and whether the user clicks back from a web page and how quickly," which "Google uses to improve [its] search services." JA__[Remedies.Op.152]*.

The court also compelled Google to syndicate its search results to competitors, meaning that Google must "provide[]" them with "the results and content for its" search engine results page to help them "deliver high-quality web results for five years." JA__[Remedies.Op.168, 180]*. It also ordered Google to syndicate search text ads so that rivals could monetize their own Google-supported offerings using ads from Google's own network of advertisers. JA__[Remedies.Op.180-86]*.

The court established a Technical Committee and tasked it with sorting out a mountain of unresolved particulars of the syndication requirement and the forced transfer of user data and the search index. JA__[Remedies.Op.211-12]*.

**3.** The parties disputed whether GenAI products that had not been part of the market at issue on liability should be "Qualified Competitors" that Google would be forced to aid. Google had proposed a remedy prohibiting Google from

distributing certain of its own GenAI products using agreements with terms "the same or similar," *Massachusetts*, 373 F.3d at 1233, to those that the district court deemed exclusive. *See* JA__[Remedies.Op.15-16]*. But Google argued that requiring it to affirmatively aid other companies' GenAI products was legally unjustified where "GenAI products are neither part of the relevant markets nor tied to [Plaintiffs'] theory of liability." JA__[Remedies.Op.101]* (citation modified).

The court emphasized the striking success of GenAI products—"chatbots, like ChatGPT, Perplexity, and Claude." JA__[Remedies.Op.1]*. The "GenAI space is highly competitive," with "numerous new market entrants" and companies with "access to a lot of capital." JA__[Remedies.Op.40-41]*. GenAI products other than Google's had "success in obtaining distribution with OEMs and other companies." JA__[Remedies.Op.42]*. The court nevertheless decided that GenAI companies that "plan to invest and compete in *or with* the GSE" market should be "Qualified Competitors" entitled to Google's aid. JA__[Remedies.Op.102-104]* (emphasis added).

**4.** The court rejected Plaintiffs' other proposed remedies because they lacked record support and threatened to harm consumers. For example, it refused to "bar[] [Google] from making payments or offering other consideration to distribution partners for preloading or placement of Google Search, Chrome, or its GenAI products" because, among other reasons, "[c]utting off payments from

Google almost certainly will impose substantial—in some cases, crippling—downstream harms to distribution partners, related markets, and consumers." JA__[Remedies.Op.4]*.

5.      In December 2025, after months of proceedings in which the parties and other interested entities dueled over further details of the remedies, the district court entered final judgment (JA__[Dkt.1462]*) and an accompanying opinion (JA__[Dkt.1461]*).  The bulk of the judgment took effect on February 3, 2026 and lasts six years.  JA__[Dkt.1462.29]*.

6.      Google moved to stay the forced data-transfer and syndication remedies pending appeal.  The district court denied that motion without prejudice as premature, reasoning that "key details such as license terms, security and privacy safeguards, and who the Qualified Competitors will be are far from established" and must await the Technical Committee's involvement. JA__[Stay.Order.5]*.

## SUMMARY OF ARGUMENT

I.      Google engaged in precisely the kind of procompetitive conduct antitrust law encourages—not the exclusionary conduct it condemns.  The district court's contrary conclusion rests on multiple distinct legal errors, any one of which requires that the judgment be reversed.

A.    Under the correct legal standards, the district court's own findings establish that Google engaged in no conduct that violates the antitrust laws.

1.    *Microsoft* prescribes the standard for assessing whether an alleged monopolist has engaged in conduct that unlawfully obtained or maintained its monopoly.  As *Microsoft* explained, a defendant violates Section 2 only by engaging in conduct that is *exclusionary*—so courts must take care to distinguish lawful competition on the merits from exclusionary conduct that significantly harms the competitive process.  253 F.3d at 58.  Only after first finding that such harm to the competitive process exists does a court go on to assess whether the exclusionary conduct contributed to the maintenance of the defendant's monopoly.  At this second step of the inquiry, *Microsoft* evaluated causation by asking whether conduct found to have been anticompetitive "reasonably appear[s] capable of making a significant contribution to" the defendant's monopoly.  *Id.* at 79.

The district court scrambled these distinct inquiries, applying the "reasonably appears capable" standard that is supposed to assess causation to decide whether Google's conduct was exclusionary in the first place.  That was an elemental error of antitrust law.  It should be obvious that exclusionary conduct cannot be defined as conduct that reasonably appears capable of contributing to maintaining monopoly power.  That approach would condemn any monopolist for succeeding on the merits by offering the best product at the best price—the very

- 29 -

thing the antitrust laws seek to encourage, even from monopolists—and thus obliterate the distinction that this Court was so careful to draw in *Microsoft*.

2.      Under the correct legal standard, the district court's findings conclusively establish that the browser agreements were lawful competition, not unlawful exclusion.  The browser-makers—not Google—made the decision to have a single out-of-the-box default, and they did so for the procompetitive reason of improving their users' experience.  The district court found that Google offered the browser-makers, including Apple, the best search engine at the best price for that particular promotional placement, which is why every browser-maker that made a deal with Google testified that it preferred Google over Google's rivals on the merits.  Fulfilling customers' specifications in this way is the "hallmark of competition," not unlawful exclusion.  *Id.* at 68.

The district court nonetheless condemned Google's conduct, holding that rivals' inability to outcompete Google was evidence that Google broke the law. That reasoning would hugely and wrongly expand the scope of Section 2 liability. Conduct does not violate the antitrust laws merely because it helps a defendant beat its rivals—lawful competition does that, too.  Conduct cannot cross the line into illegality unless it prevents a defendant's rivals from winning even if they have a better product or make a better offer.  Google never did anything like that. As in other Section 2 cases rejecting similar theories of liability, there was no proof

that a better product would lose to Google and no finding that Google coerced any browser-maker into selecting its GSE as the default. To the contrary, the district court affirmatively found that that browser-makers preferred Google's offer on the merits.

3.      The district court's assessment of whether Google's conduct was exclusionary was not just wrong, but unnecessary, because Google's browser agreements were not the kind of exclusive dealing agreements that could give rise to antitrust liability. The district court thus erred at the outset in concluding otherwise. An exclusive dealing agreement requires one party to deal with the counterparty *and not with rivals*. Google's browser agreements were not exclusive deals. Apple and Mozilla remained free to promote and meet users' demand for rival GSEs—and they did so. The facts that the browser agreements had "no express exclusivity provision," JA__[Liability.Op.207]*, and that "[u]sers are free to navigate to Google's rivals through non-default search access points," JA__[Liability.Op.209]*, should have ended the exclusivity inquiry—and ended Plaintiffs' case with it because exclusive dealing was Plaintiffs' only theory at trial.

The district court nevertheless erroneously held that the browser agreements should be deemed exclusive as a *de facto* matter because users often ran queries through default settings preset to Google. Of course, users did so because they overwhelmingly prefer Google on the merits, as the district court's own findings

confirm.  That cannot be a basis for antitrust liability.  And even if the browser agreements were considered exclusive because Google was the only GSE preset as the default, that still would not justify imposing antitrust liability.  Apple and Mozilla chose to design their products with only one preset default and chose Google for that default because it made the best offer.

4.    Plaintiffs' challenges to the Android agreements, which accounted for a small share of queries, cannot alone sustain their case.  The district court's decision depended on finding *all* the agreements unlawful.

B.    The district court also erred in defining the relevant market, which independently requires reversal.  Monopoly power in a properly defined market is a predicate to any Section 2 claim.  The district court was able to conclude that Google had monopoly power only because it defined the market to exclude key competitors.  The court found that users can turn to GSEs and SVPs for the same purpose of answering commercial queries and that users' ability to choose SVP alternatives has pressured Google to improve the quality of its GSE to attract queries.  Those commercial realities established that the market includes SVPs.  Google lacks monopoly power in such a market.  The court nonetheless put GSEs in a separate market because they also answer *noncommercial* queries.  That was a legal error.

**II.** Even if the district court's liability determination were correct, its remedial order would have to be vacated because the court egregiously exceeded the bounds of its remedial discretion.

**A.** The district court abused its discretion by failing to apply the correct legal standards. Like any remedy, an antitrust injunction "should be tailored to fit the wrong." *Microsoft*, 253 F.3d at 107. Accordingly, to impose a remedy that goes beyond ordering the cessation of the conduct found unlawful, the court must assess the "causal connection between [the defendant's] anticompetitive conduct and its dominant position in the [relevant] market." *Id.* at 106.

The district court made none of the findings necessary to justify the extraordinary step of ordering Google to boost its competitors through data-transfer and syndication. There were no findings—none, at any stage—about how much (if any) of Google's market position was attributable to Google's supposedly unlawful exclusive deals as opposed to its lawful advantages, business foresight, superior product, and superior monetization. Without such findings, the court necessarily abused its discretion because it lacked any yardstick to measure whether the consequences of forcing Google to aid competitors were commensurate with the effects of Google's conduct.

**B.** Even if there had been a basis for the district court to order *some* data-transfer and syndication, no plausible basis existed for extending those remedies to

- 33 -

GenAI companies that do not even seek to offer a GSE.  GenAI products did not even *exist* at the time of Google's challenged conduct and the GenAI market is "highly competitive," JA__[Remedies.Op.40-41]*; nothing "link[s]" remedies for GenAI products to the "liability" decision regarding GSEs, *Massachusetts*, 373 F.3d at 1226.

## STANDARD OF REVIEW

This Court reviews conclusions of law de novo.  *Microsoft*, 253 F.3d at 50. Findings of fact should be set aside if "clearly erroneous."  *Id.*; Fed. R. Civ. P. 52(a).  The district court's equitable remedies are a matter of the court's discretion, *Massachusetts*, 373 F.3d at 1207, but a "district court's error of law is by definition an abuse of discretion," *Jeffries* v. *Barr*, 965 F.3d 843, 855 (D.C. Cir. 2020) (citation modified).

## ARGUMENT

The district court made several fundamental errors of law in holding Google liable for engaging in vigorous competition on the merits.  The court found Google did the very things that antitrust law *promotes*—succeeding through superior technology and business acumen, and then contracting to distribute and promote its superior product at the best price.  And yet, applying the wrong legal standard, the court mistook that success as proof of unlawful conduct.  The court then tried to "remedy" Google's legitimately gained advantages by forcing Google to give them

to other companies—not only to its GSE rivals, but also to wildly successful GenAI companies that could not have been affected by Google's conduct. That, too, was error. The legal underpinnings of the decision below, if upheld, would empower courts to punish large firms of all kinds simply for succeeding and would leave businesses across the economy at sea about how to conform their conduct to the law.

## I. The District Court's Liability Determination Reflects Multiple, Independent Errors of Law

Section 2 does not outlaw monopolies. It proscribes exclusionary conduct by monopolists. *See Verizon Commc'ns, Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004) (Section 2 "seeks [] to prevent *unlawful monopolization*," not to "*eliminate the monopolies*" some firms enjoy). "[M]onopolization has two elements: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 50 (quoting *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

***Monopoly Power.*** To assess monopoly power, courts "examine market structure" and define the relevant market. *Id.* at 51. "Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Walker Process Equipment, Inc.* v. *Food Machinery & Chemical*

- 35 -

*Corp.*, 382 U.S. 172, 177 (1965).  "Because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the relevant market must include all products reasonably interchangeable by consumers for the same purposes." *Microsoft*, 253 F.3d at 51-52 (citation modified).

***Exclusionary Conduct.***  After proving that a firm possesses monopoly power in a well-defined market, the plaintiff must prove that the firm "acquire[d] or maintain[ed]...a monopoly by engaging in exclusionary conduct." *Id.* at 58. Thus, the second element of a Section 2 violation has two components:  (1) exclusionary conduct, and (2) a causal connection between the conduct and the defendant's monopoly.  *See, e.g.*, *id.* at 58-78 (first evaluating whether Microsoft "engage[d] in any exclusionary conduct"); *id.* at 78-80 (then evaluating the "causal link between [the] anticompetitive conduct" "and the maintenance of…monopoly").

The exclusionary conduct alleged here was "exclusive dealing." JA__[Liability.Op.203]*.  The "prerequisite to any exclusive dealing claim" is "an agreement to deal exclusively." *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).  An "exclusive-dealing arrangement is a contract" that "forbids the buyer from purchasing the contracted good from any other seller."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1800a (updated May 2026).

Critically, not all exclusive dealing is unlawful exclusionary conduct. "[E]nter[ing] into an exclusive deal" is a "presumptively legitimate business practice" that "may serve many useful purposes." *Microsoft*, 253 F.3d at 69. To be "condemned as exclusionary" conduct, a monopolist's exclusive deal *also* "must have an 'anticompetitive effect'" that is "substantial." *Id.* at 58, 69, 71. Thus, caselaw often uses the terms "exclusionary" and "anticompetitive" to describe conduct that "has the requisite anticompetitive effect," *id.* at 58-59, and can be unlawful under Section 2. An act is not anticompetitive simply because it "harm[s]…one or more *competitors*." *Id.* at 58. Rather, conduct "must harm the competitive *process* and thereby harm consumers." *Id.* Pursuit of "greater efficiency or enhanced consumer appeal" is core to the competitive process; such "competition on the merits" cannot be exclusionary. *Id.* at 59. Only conduct "other than competition on the merits" can harm the competitive process. *Id.* at 62.

Finally, as noted, the plaintiff must complete its proof by "establish[ing] a causal link between [the] anticompetitive conduct…and the maintenance of [the] monopoly." *Id.* at 78.

In finding Google liable, the district court piled error upon error—in assessing monopoly power, in labeling the browser agreements "exclusive dealing," and in condemning those agreements as exclusionary. Any one of those errors requires that the judgment be reversed. This brief begins with the last point

because it reflects a grave misreading of this Court's en banc precedent in

*Microsoft* and threatens to turn all of Section 2 law upside down by outlawing

competition on the merits.

> **A.    The District Court Erred in Holding that Google Engaged in Exclusionary Conduct**

In the competitive process, consumers "select among alternative offers," and

firms vie to make the best offer. *Nat'l Soc'y of Pro. Eng'rs* v. *United States*, 435

U.S. 679, 695 (1978).  Antitrust law accordingly draws a sharp distinction between

(1) making a better offer to a consumer and (2) depriving a consumer of the

freedom to accept a better offer.  The former is central to the competitive

process—it *is* competition on the merits—and cannot be exclusionary.  The latter

can interfere with the competitive process and can be exclusionary.

Vying to make the best offer cannot harm the competitive process because

"offering a customer an attractive deal is the hallmark of competition." *Microsoft*,

253 F.3d at 68.  "[T]he antitrust laws do not condemn even a monopolist for

offering its product at an attractive price." *Id.*[5]  "Likewise…a monopolist does not

---

[5] *Microsoft* correctly qualifies this statement, reserving the "very rare circumstance[]" of predatory pricing, in which a monopolist prices below its cost, aiming to "drive out its rivals…and then, sometime in the future, raise its prices…above the competitive level in order to recoup its earlier losses."  253 F.3d at 68.  Predatory bidding is the mirror image, requiring at a minimum that the monopolist bids more to acquire inputs than the inputs are worth to it.  *See Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 324-25 (2007).  Predation is irrelevant here because Plaintiffs conceded that Google did

violate the Sherman Act simply by developing an attractive product." *Id.* Offering the best product or the best price is "competition on the merits," *id.* at 56, even though doing so almost by definition takes sales away from rivals. "Competition, after all, is a ruthless process." *Novell, Inc.* v. *Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013) (Gorsuch, J.) (citation omitted). Every competition has winners and losers; whenever one firm wins a sale, there is "harm to one or more *competitors*" that lose out, but that "will not suffice" to prove antitrust wrongdoing. *Microsoft*, 253 F.3d at 58. Where rivals cannot match the winner's offer, the most natural inference is that the winner is competing on the merits.

Maintaining the distinction between making the best offer and interfering with better offers is essential to protecting the competitive process by ensuring that firms are not penalized for participating lawfully and vigorously in that process. But that distinction was lost on the district court. Indeed, under the correct legal standards, the district court's findings require judgment for Google:

- Slightly more than half of all U.S. queries to GSEs flow through channels where nobody claims Google engaged in any wrongdoing.

- Another 28% of queries flow through Apple's Safari or Mozilla's Firefox, but Google's agreements with those browser-makers embodied lawful competition on the merits. And regardless, the browser agreements were not even "exclusive" deals, because they

---

not overpay—its agreements were profitable. *See* JA__[Dkt.906.113-14] (Proposed Findings of Fact).

permitted browser-makers to promote rival GSEs, which the browser-makers did.

- The remaining 19% of queries are made on Android devices. The Android agreements were not a freestanding basis for liability and, regardless of their terms, cover too few queries to support liability.

### 1. The District Court Used the Wrong Legal Standard for Identifying Exclusionary Conduct

At Plaintiffs' urging (*see* JA__[Plaintiffs'.PCOL.Dkt.838.11]), the district court held that the "key question" for identifying exclusionary conduct was whether the challenged agreements "reasonably appear capable of significantly contributing to maintaining Google's monopoly power in the general search services market." JA__[Liability.Op.216]*. The court answered "yes" because Google's contracts "clearly have a significant effect in preserving [Google's] monopoly." JA__[Liability.Op.216]*. That was a grievous legal error: the "reasonably appear capable" test that the court quoted from *Microsoft* is the test for determining whether conduct *already found to be exclusionary* had the requisite "causal link" to "the maintenance of [the] monopoly," 253 F.3d at 78, not whether conduct is exclusionary *in the first place*.

**a.** The *Microsoft* opinion was careful to address "Anticompetitive Conduct" and "Causation" separately. *Id.* at 58-78 ("Anticompetitive Conduct"); *id.* at 78-80 ("Causation"). When it assessed "Anticompetitive Conduct," this Court never asked whether Microsoft's conduct "reasonably appeared capable" of

- 40 -

contributing to its monopoly.  Rather, this Court determined that Microsoft's conduct was "anticompetitive" because it was not "competition on the merits."  *Id.* at 62.

Many pages later, under the heading "Causation," and only *after* finding Microsoft's conduct exclusionary, this Court addressed Microsoft's "final parry" that "plaintiffs never established a *causal link* between Microsoft's *anticompetitive conduct*," on the one hand, "and the maintenance of Microsoft's operating system monopoly," on the other.  *Id.* at 78 (emphasis added).  In rejecting Microsoft's argument, this Court was willing to "infer '*causation*' from the fact that a defendant *has engaged in anticompetitive conduct* that 'reasonably appear[s] capable of making a significant contribution to…maintaining monopoly power.'" *Id.* at 79 (emphasis added); *accord id.* (recognizing a court sometimes "may infer causation when exclusionary conduct is aimed at [rivals]").  This Court famously described the "reasonably appears capable" standard as an "edentulous test for causation." *Id.*

Thus, as Judge Ginsburg has explained, the "reasonably appears capable" standard was "conditioned on [this Court's] having found anticompetitive effects" and assessed "causation," which is a "separate and distinct question."  Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging Consummated Mergers Under Section 2*, at 2-3, CPI North America Column (May 2020).  The "reasonably

- 41 -

appears capable" standard is simply not a test for whether conduct is exclusionary, yet the district court used it as its polestar for that critical question.[6]

**b.** Indeed, "reasonably appears capable" *cannot* be the test for exclusionary conduct because it would proscribe paradigmatically competitive activity—"the very conduct the antitrust laws are designed to protect," *Weyerhaeuser*, 549 U.S. at 320 (citation omitted). "The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447, 458 (1993). Offering the best price or the best product is the very definition of competition on the merits and cannot be exclusionary. *See supra*, pp. 38-39. But under the district court's test, offering the best price or the best product alone *would* be exclusionary because each is plainly "capable" of maintaining a monopoly.

The test that the district court applied—so easily met that it is "edentulous," *Microsoft*, 253 F.3d at 79—would condemn all manner of conduct that the antitrust

---

[6] The "reasonably appears capable" standard would not even be the right causation test here. *Microsoft*'s reason for identifying that standard was that when exclusionary conduct aims at *nascent* rivals, nobody "can confidently reconstruct a product's hypothetical technological development in a world absent the defendant's exclusionary conduct." 253 F.3d at 79. This case is entirely different. Products like Bing and Yahoo! were mature, and there was a decade-long record of Apple's negotiations with Google and Microsoft and Mozilla's negotiations with Google and Yahoo!.

laws seek to foster.  And it would deny monopolists seeking to conform their conduct to the law with any guidance on how to "distinguish[]" between "competitive acts," which are lawful, and "exclusionary conduct," which is not. *Id.* at 58; *cf. linkLine*, 555 U.S. at 452 (Supreme Court has "repeatedly emphasized the importance of clear rules in antitrust law").

    **c.**    No court of appeals has *ever* held conduct exclusionary simply because, in the district court's words, it "reasonably appear[ed] capable of significantly contributing to maintaining [the defendant's] monopoly power," JA__[Liability.Op.216]*.

    The district court relied on little beyond its misreading of *Microsoft* to support its misconceived approach to assessing exclusionary conduct.  It cited *Viamedia, Inc.* v. *Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), but that opinion— like *Microsoft*—has a separate, antecedent discussion of exclusionary conduct, *id.* at 452-77, and likewise invoked the "reasonably appears capable" standard only in the context of "causation," *id.* at 485.  The district court also cited *City of Oakland* v. *Oakland Raiders*, 20 F.4th 441, 460 (9th Cir. 2021), but that opinion concerns private parties' antitrust standing and quotes the "reasonably appears capable" standard in a footnote to explain that *Microsoft* "did not address the question presented here," *id.* at 460 n.13.

**d.** Thus, the district court ultimately held that Google's conduct was unlawful only because it reasonably appeared capable of contributing to Google's continued success. That root error infected every branch of its analysis. As explained immediately below, applying the correct test to its factual findings unambiguously establishes the lawfulness of Google's conduct. This Court should therefore reverse, or at a minimum vacate the judgment for further proceedings under the correct standard for exclusionary conduct.

> **2.  Under the Correct Legal Standard, the Browser Agreements Reflected Competition on the Merits, Not Exclusion, Requiring Judgment for Google**

>> **a.  The Browser Agreements Were Lawful Competition on the Merits**

**i.** "[O]ffering a customer an attractive deal is the hallmark of competition." *Microsoft*, 253 F.3d at 68. Such "competition on the merits," *i.e.*, offering "greater efficiency or enhanced consumer appeal," *id.* at 59, is not exclusionary. Rather, as the United States recently explained to the Supreme Court, "the bedrock definition of anticompetitive conduct" is "action that excludes competition *on some basis other than efficiency*." Brief for the United States as Amicus Curiae at 23, *Duke Energy Carolinas, LLC* v. *NTE Carolinas II, LLC*, No. 24-917 (U.S. Dec. 1, 2025) ("U.S. *Duke* Brief") (emphasis added). A full examination of the impacts, character, and justifications for challenged conduct is

required before condemning it as exclusionary (*see generally Microsoft*, 253 F.3d at 61-71), but competition on the merits can never be exclusionary.

Thus, in *Microsoft*, Microsoft's "offering" Internet Explorer and its software development kit "free of charge or even at a negative price" was lawful because it was competition on the merits as a matter of law. *Id.* at 68-69. By contrast, Microsoft's refusal to license Windows unless a computer-maker agreed to a "prohibition on modifying the boot sequence" was something "other than competition on the merits." *Id.* at 62. "Prior to the imposition of that restriction," many computer-makers used the boot sequence to promote Internet-access software that used rival browsers. *Id.* By prohibiting computer-makers from continuing to make that choice, Microsoft's conduct "ha[d] the effect of decreasing competition against [Internet Explorer] by *preventing [the computer maker] from promoting rivals' browsers*." *Id.* (emphasis added).

**ii.**    Google's browser agreements resulted from competition on the merits. Browser-makers' ability to promote one GSE or another is extremely valuable. By offering the best GSE with the best monetization, Google made the best offer for the out-of-the-box default position that browser-makers themselves designed into their products and from which they sought to profit.

What Google offered was necessarily bounded by what the browser-makers designed. Apple made a "carefully considered" product design decision to build its

- 45 -

"Safari browser to have a single default search engine out-of-the-box."
JA__[Liab.Tr.2623-2624] (Cue).  Apple designed the same out-of-the-box default
GSE on "all devices" because it did not want "an inferior experience on a Mac
versus a phone."  JA__[Liab.Tr.2476-2479] (Cue).  Firefox and Microsoft likewise
designed their browsers with a uniform out-of-the-box default GSE,
JA__[Liability.Op.14]*, and there was no evidence that any browser-maker had
ever offered different GSEs across devices or browsing modes.

　　Google won the uniform default position that browser-makers created fair
and square.  Compared to other GSEs, Google offered both "greater efficiency"
and "enhanced consumer appeal," *Microsoft*, 253 F.3d at 59.  As the district court
found, the browser-makers chose Google because they "value its quality, and they
continue to select Google as the default because its search engine provides the best
bet for monetizing queries."  JA__[Liability.Op.199]*.  Apple described choosing
Google as a "no brainer" because it was "a sure thing.  They have the best search
engine, they know how to advertise, and they're monetizing really well."
JA__[Liability.Op.113]*.  Bing, by contrast, was "horrible at monetizing
advertising."  JA__[Liability.Op.112]*.

　　In short, browser-makers stood to gain the most from setting Google as the
default because (1) users preferred for Google's higher-quality GSE; (2) that
preference would lead users to run more queries using the default if it were preset

- 46 -

to Google; and (3) Google's technology would better monetize those queries.  That is why Apple was uninterested in making Bing the default even if Microsoft shared "100% of its Bing revenue" or "offered to give us Bing for free" or "g[a]ve us the whole company."  JA__[Liability.Op.112-13]* (quoting JA__, __/Liab.Tr.2511, 2530 (Cue)).  There was not a "price in the world that Microsoft could offer."  JA__[Liability.Op.113]* (quoting JA__/Liab.Tr.2530 (Cue)).  Apple also "never genuinely considered using [DuckDuckGo] as the default in Safari's private browsing mode" because "it syndicates its results from Bing," whose "search quality" Apple viewed "as inferior to Google's."  JA__[Liability.Op.115]*.

Mozilla, too, determined "that switching the Firefox default to a rival search engine 'would be a losing proposition' because no competitor could monetize search as effectively as Google."  [JA__[Liability.Op.201]*] (citing Mozilla letter).  Mozilla learned that lesson the hard way when it switched from Google to Yahoo! in 2014; the disappointing results caused Mozilla to later reverse course.  *See supra*, pp. 19-20.

The district court's factual findings thus unequivocally establish that Apple and Mozilla chose Google Search for its superior quality and efficiency.  The court did not find, and Plaintiffs did not prove, that browser-makers opted for Google for any other reason.  That should have been the end of the matter.

**iii.** It was not the end of the matter only because the district court reasoned backwards from Google's large lead over its rivals to conclude that Google must have engaged in exclusionary conduct. That was a profound error. Antitrust law recognizes that all firms—including monopolists—act *lawfully* by using their competitive advantages to offer consumers the best product at the best price.

*First*, the court held that Google could not have been competing on the merits because it kept winning: Google had not "lost business" while the browser agreements were in place; "a rival dislodged Google as the default GSE" only once in 22 years; and Bing "never held a market share above 11%." JA__[Liability.Op.200]*.

The court's attempt to reason backwards from the state of the marketplace to the lawfulness of Google's behavior was, indeed, backwards. "It is not mere monopoly (a status or condition), but rather monopolization (an activity) that Section 2 condemns." *City of Mt. Pleasant* v. *Associated Elec. Co-op.*, 838 F.2d 268, 280 (8th Cir. 1988). Section 2 liability must be based on what the defendant did, not on how well its rivals are doing. "[T]he proper focus of section 2 isn't on protecting competitors but on protecting the process of competition, with the interests of consumers, not competitors, in mind." *Novell*, 731 F.3d at 1072. Antitrust law does not guarantee every firm—or any firm—a turn to win. Even a

- 48 -

"monopolist's successful elimination of a rival alone is an insufficient condition to prove harm to competition," *In re EpiPen Marketing, Sales Practices & Antitrust Litig.*, 44 F.4th 959, 986 (10th Cir. 2022), so the low market shares of other GSEs did not suggest, much less prove, harm to the competitive process. The district court's contrary conclusion condemned Google's extraordinary success, not its conduct, in precisely the manner that the antitrust laws are designed to guard against. *Alcoa*, 148 F.2d at 430 (Hand, J.) ("The successful competitor, having been urged to compete, must not be turned upon when he wins.").

The same error drove the district court to the misguided conclusion that, because "Microsoft stood no realistic chance of beating Google for the Apple default," Google had violated the law by "disincentivizing Microsoft from enlarging its investment in search." JA__[Liability.Op.239]*. Google's competitors had no one but themselves to blame for their lagging performance. As the district court found, they lacked Google's "fores[ight] that the future of search was on mobile," which Microsoft "was slow to recognize" and consequently "has been trying to catch up—unsuccessfully—ever since." JA__[Liability.Op.200]*. Google did not violate Section 2 simply because Microsoft found itself so far behind that it chose not to throw good money after bad.

*Second*, the district court held that Google was not competing on the merits because Google's agreements "deny rivals access to user queries, or scale," and

have "constrained the query volume of [Google's] rivals." JA__[Liability.Op.226, 234]*. That again was error. Precedent firmly establishes that a monopolist can lawfully win scale and that using a scale advantage to make the best offer is competition on the merits. *Berkey Photo, Inc.* v. *Eastman Kodak Co.*, 603 F. 2d 263, 276 (2d Cir 1979) ("A large firm does not violate § 2 simply by reaping the competitive rewards attributable to its efficient size.").

When one firm wins, its rivals lose, so conduct that helps a firm win more customers and gain scale can be expected to deny rivals scale. *Cf. Town of Concord* v. *Bos. Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990) (Breyer, J.) ("almost all business activity, desirable and undesirable alike, seeks to advance a firm's fortunes at the expense of its competitors"). But "harm to one or more *competitors* will not suffice" for liability. *Microsoft*, 253 F.3d at 58. If a monopolist's conduct were unlawful whenever it denies rivals scale, then a monopolist would violate Section 2 whenever it competed successfully.

That proposition is, however, one that antitrust law unambiguously rejects. A monopolist "must be free to compete like everyone else." *EpiPen*, 44 F.4th at 985 (citation modified). Indeed, "it is in the interest of competition to permit dominant firms to engage in vigorous competition." *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986) (citation modified). Insisting that Google "pull[] its competitive punches" would injure consumers and undermine

the basic purpose of the antitrust laws.  *Olympia Equip. Leasing Co.* v. *W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986) (Posner, J.).  "Forcing monopolists to hold an umbrella over inefficient competitors might make rivals happy but it usually leaves consumers paying more for less."  *Novell*, 731 F.3d at 1072 (citations omitted).  Google should be just as free as its rivals to offer the most "attractive deal"—the "hallmark of competition."  *Microsoft*, 253 F.3d at 68.

The law permitted Google to compete by making the most attractive offer to its customers even if it had "access to scale that its rivals cannot match," which has left them "at a persistent competitive disadvantage."  JA__[Liability.Op.226]*.  The district court found that Google established its scale lawfully.  "By 2009— many years before the time period in which its browser agreements were allegedly giving it an unlawful advantage—Google had already attracted more than 80% of queries in the U.S. because it had the best GSE.  JA__[Liability.Op.13]*.  If scale is a decisive advantage in the GSE market, then Google won it long ago;  it "has long been the best search engine, particularly on mobile."  JA__[Liability.Op.199]*.

There is nothing unlawful in "establishing an infrastructure that renders [a firm] uniquely suited to serve [its] customers."  *Trinko*, 540 U.S. at 407; *see Berkey Photo*, 603 F.2d at 274 ("[a] firm that has lawfully acquired a monopoly position is not barred from taking advantage of scale economies.").  To the extent

that scale enables a GSE to perform better, deploying that "greater efficiency" earned through "enhanced consumer appeal" was "a form of competition on the merits" that is by definition not exclusionary. *Microsoft*, 253 F.3d at 59; *see Connell Const. Co.* v. *Plumbers & Steamfitters Loc. Union No. 100*, 421 U.S. 616, 623 (1975) ("[C]ompetition based on efficiency is a positive value that the antitrust laws strive to protect."); U.S. *Duke* Brief at 23 (United States' own test for exclusionary conduct involves asking whether defendant succeed "*on some basis other than efficiency*" (emphasis added)).

Because Google established a scale advantage by having the "business acumen" to build a "superior product" before its rivals, *Microsoft*, 253 F.3d at 58, premising liability on the rivals' "competitive disadvantage" improperly punished Google's innovation and foresight and sought to regulate Google's success rather than adjudge its conduct. To borrow the Supreme Court's observation about another industry (telecommunications) marked by incumbents with built-in scale advantages, the district court made "a serious mistake to conflate" antitrust law's aim "to prevent *unlawful monopolization*" with "*eliminat*[ing] *the monopolies* enjoyed by" those incumbents. *Trinko*, 540 U.S. at 415 (citation omitted).

Equally to the point, the district court's reasoning would leave firms without guidance on how to conform their conduct to the law. Neither Plaintiffs nor the district court ever explained how a firm in Google's position could ever know

when its scale advantages were so significant that making the most attractive offer was no longer lawful longer competition on the merits. And no standard exists for deciding when a successful firm must stop trying to make its best offer because doing so will put its rivals too far behind. *Cf. linkLine*, 555 U.S. at 454 (noting lack of standards to implement a theory that a firm "must leave its rivals a 'fair' or 'adequate' margin"). Any such rule would be "beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate procompetitive conduct." *Weyerhaeuser*, 549 U.S. at 325 (citation modified).

*Third*, the district court viewed Google's agreement with Apple as a way to "keep[] Apple on the sidelines" because it "disincentivizes Apple from launching its own search engine when it otherwise has built the capacity to do so." JA__[Liability.Op.242]*. That cannot possibly be the law. The same could *always* be said when *any* firm in Apple's position prefers to contract with another firm for an input rather than build the same input in-house. Any "disincentiv[e]" arises from the product features and payments the other firm (here, Google) is willing to provide. Treating that "disincentiv[e]" as exclusionary would create the "perverse result," *Cargill*, 479 U.S. at 116, that the better Google's offer, the more unlawful its conduct.

There was nothing nefarious in Google "pay[ing] billions in revenue share when it already has the best search engine" (JA__[Liability.Op.201]*). Plaintiffs

- 53 -

in fact *disclaimed* any contention that Google's payments made sense only as a bribe to maintain its monopoly power. *See supra*, note 5. And Google could offer browser-makers more than rivals could precisely because it had the most attractive product and the best monetization, and thus would generate the most revenue to be shared—those "billions in revenue share" were only a *share* of the revenue generated. It is wholly natural for customers holding something of great value (as Apple and Mozilla did) to bargain hard for a larger share of the revenue that default placement offered. That is the competitive process at work.

***

The district court found that Google developed and maintained the best product through foresight and innovation, which enabled it to make the best offer for the out-of-the-box default placement that Apple and Mozilla designed and chose to sell. That is exactly what the antitrust laws seek to foster and cannot be unlawful.

### b.     Google Never Prevented a Browser-Maker from Choosing a Rival's Offer that It Preferred

At the same time, nothing about the browser agreements interfered at all with rivals' ability to make, or any browser-maker's ability to accept, a better offer. In a case like this, conduct that does not interfere with customers' ability to obtain and choose the offer they prefer does not violate Section 2 because it cannot harm the competitive process.

- 54 -

**i.**     This Court's precedent makes that clear.  In *Rambus*, this Court overturned the FTC's monopolization determination because the FTC "failed to demonstrate that Rambus's conduct was exclusionary."  522 F.3d at 467.  The FTC had found that Rambus deceived a standard-setting organization (JEDEC) that ultimately incorporated Rambus's patented technology into an industry standard, thereby giving Rambus monopoly power.  *Id.* at 461-62.  But the FTC could not say whether, absent the deception, JEDEC would have chosen a rival's technology, or would have still chosen Rambus's technology but instead sought a commitment from Rambus to license its patents on certain terms.  *Id.*  "Rambus's alleged deception cannot be said to have had an effect on competition in violation of the antitrust laws" if JEDEC "would have standardized the very same technologies"— *i.e.*, if JEDEC would have had the same preference for Rambus's product—"in the world that would have existed but for Rambus's deception."  *Id.* at 466-67.  Because the FTC made no findings that Rambus prevented JEDEC from choosing a rival technology, it was improper to hold Rambus's conduct to be exclusionary.

*Rambus* is dispositive here because the district court did not find, and Plaintiffs did not prove, that the browser agreements prevented any browser-maker from choosing a rival GSE if it preferred one.  The court did not find that browser-makers would have chosen another GSE as the out-of-the-box default in a world

- 55 -

without the browser agreements.  Instead, the court found the exact opposite—that Apple and Mozilla "*prefer* Google because of its search quality" and its "high revenue share."  JA__[Liability.Op.227]* (emphasis added); *accord* JA__[Remedies.Op.121]* (finding at the remedies stage that, because "Google is the best search provider," Apple and Mozilla "likely will maintain it as the default GSE" in order "to avoid alienating their customers").

The only reason the district court gave for disregarding *Rambus*—that it "involved deception to a standards-setting organization," JA__[Liability.Op.219]*—is refuted by *Rambus* itself:  "Deceptive conduct—*like any other kind*—must have an anticompetitive effect in order to form the basis of a monopolization claim."  522 F.3d at 464 (emphasis added).

*Microsoft* is the counterpoint that confirms the rule, because some of Microsoft's conduct was indeed exclusionary.  Consider how Microsoft exploited computer manufacturers' dependence on Windows to force them to give up the internet browser they would have chosen on the merits—Netscape Navigator.  It was anticompetitive for Microsoft to force computer manufacturers to accept contractual prohibitions on modifying the Windows desktop to "promote rival browsers," which the manufacturers had done "prior to Microsoft[] prohibiting the practice."  253 F.3d at 62.  Computer manufacturer Hewlett-Packard wrote Microsoft, "If we had a choice of another supplier, based on your actions in this

area, I assure you [that you] would not be our supplier of choice." *Id.* (citation omitted).

Or consider how Microsoft deployed various inducements on the key condition that its partners give up the ability to freely transact with Microsoft's rivals. *See id.* at 68 (inducement Microsoft offered AOL conditional on AOL "not promot[ing] any non-Microsoft browser" and limiting non-Internet Explorer browsers furnished on customer request to 15%); *id.* at 75-76 (inducements to software vendors conditional on their software working only with Microsoft's Java implementation and on their not distributing rival Sun's Java implementation).

The facts here are the polar opposite: "Google's partners value its quality, and they continue to select Google as the default because its search engine provides the best bet for monetizing queries." JA__[Liability.Op.199]*.

**ii.**    The law beyond this Circuit is in accord. Monopoly power is the power to "force a purchaser to do something that he would not do in a competitive market," *Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) (citation omitted), and the law guards against maintaining a monopoly by unlawfully using that "power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice," *ZF Meritor*, 696 F.3d at 285.

- 57 -

Thus, as even the district court recognized, the "classic illustration" of exclusionary conduct is a monopolist's "insistence that those who wish to secure a firm's services cease dealing with its competitors." JA__[Liability.Op.227]* (citation omitted). "Insistence" can take many forms—threats to withhold the defendant's product, demands for all-or-none deals, inducements that come with strings attached aimed at excluding rivals, etc. For example, when a customer prefers a rival for some of its demand but cannot carry on without the defendant's product, "[t]he threat to cut off supply ultimately provide[s] customers with no choice but to continue purchasing from the defendant[]." *Eisai, Inc.* v. *Sanofi Aventis U.S., LLC*, 821 F.3d 394, 406 (3d Cir. 2016).

Or, consider the Section 2 cases that Plaintiffs cited below or the district court relied on. *See, e.g.*, JA__[Plaintiffs'.PCOL.Dkt.838.15]; JA__[DOJ.PTB.32]; JA__[Liability.Op.203-04, 215, 233]*.[7] Every one rests Section 2 liability on some coercive or market-distorting conduct:

- In *Lorain Journal Co.* v. *United States*, the dominant local newspaper "refused to accept local advertisements" from any advertiser that advertised for an emergent radio station. 342 U.S. 143, 148 (1951). Because advertising in the paper "was essential for the promotion" of products in the county, numerous advertisers "testified that, as a result

---

[7] Many of Plaintiffs' cases were offered as part of their "dramatic post-trial shift" away from their exclusive dealing theory and the requirements for an exclusive dealing claim—a shift the district court rejected. JA__[Liability.Op.203]*. Google discusses them here for completeness.

of the publisher's policy, they either ceased or abandoned their plans to advertise" at the radio station. *Id.* at 148-49.

- *Chase Manufacturing, Inc.* v. *Johns Manville Corp.*, 84 F.4th 1157 (10th Cir. 2023), allowed a case to go to trial on the theory that the monopolist "was able to bend the market unlawfully in its favor by threatening distributors that [the defendant] would refuse to supply them with its product[]." *Id.* at 1171. This theory was supported by evidence that distributors were refusing to buy rivals' products, even though the rivals' products had a "lower price and superior quality." *Id.*

- In *McWane, Inc.* v. *FTC*, the defendant manufacturer adopted a policy in which distributors that opted to buy "from other companies" would be "cut off" from the defendant's products for up to three months. 783 F.3d 814, 820-21 (11th Cir. 2015). Some distributors were "initially interested in purchasing" from rival manufacturers, but decided to "cancel pending orders" and "prohibited their branches" from buying from rivals "even when" the rivals "promised lower prices." *Id.* at 837-38.

- In *United States* v. *Dentsply International, Inc.*, Dentsply adopted a policy that "authorized dealers" of its dental products could "not add further tooth lines to their product offering." 399 F.3d 181, 185 (3d Cir. 2005). Some distributors' "customers requested" rival product lines, but the distributors "chose not to add" rivals' offerings because "doing so would cut off access to Dentsply teeth." *Id.* at 194. Some distributors added rival product lines "to meet customers' requests, but dropped them after Dentsply threatened to stop supplying its product." *Id.*

- In *ZF Meritor*, the dominant manufacturer of truck transmissions required truck manufacturers to delist rival transmissions from product data books. 696 F.3d at 277. "[T]here was considerable testimony that the [truck manufacturers] did not want to remove ZF Meritor's transmissions from their data books, but that they were essentially forced to do so or risk financial penalties or supply shortages." *Id.* Although a "compet[ing] product…was being demanded by truck buyers," one truck manufacturer "felt that [the defendant] was holding it 'hostage.'" *Id.*

- 59 -

By contrast, browsers-makers' preference for Google aligns this case with cases that *reject* claims of exclusionary conduct. For example, *Eisai* held that a pharmaceutical company's exclusive deals with hospitals were not anticompetitive because the plaintiff had shown that only "a few dozen hospitals out of almost 6,000 in the United States" actually wanted to purchase a competitor's product. 821 F.3d at 404. No evidence showed that an "equally efficient" competitor—if one existed—would have been unable to win the exclusive contract. *Id.* at 406.

Similarly, *EpiPen* refused to condemn exclusive rebate agreements for certain pharmaceuticals because "in the absence of any coercion" by the contracting parties, aspiring rivals "need only offer a better product or a better deal to reverse, and possibly wield, exclusivity." 44 F.4th at 989 (citation modified). Because a product with better quality or better price (or both) could still win in the market, the exclusive agreements did not harm the competitive process. *See id.* at 989-90. The court noted that the rival did not win because it priced "at a premium" and "refused to seek out exclusivity or deeply discount its" product, which "turned out to be a mistake." *Id.*[8]

---

[8] Certainly, the universe of anticompetitive conduct is broader than the span of the cases cited in the text. *See Caribbean Broad. Sys., Ltd.* v. *Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) ("'[a]nticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties"). But Plaintiffs asserted that Google engaged in exclusive dealing, and every case cited below holding against the defendant on such a theory involved coercion or market-distorting

**iii.** Here, as in *Eisai* and *EpiPen*, there was *no* evidence that any browser-maker preferred a rival to Google (let alone that it was prevented from taking a better deal from a rival); there was *no* proof that a better GSE would nonetheless lose to Google Search; there was *no* coercion; and there was *no* all-or-nothing ultimatum. Far from complaining that Google's agreements held them "hostage," *ZF Meritor*, 696 F.3d at 277, Apple and Mozilla pleaded with the district court to keep those agreements in place. *See Menasha Corp.* v. *News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) (Easterbrook, J.) ("When the consumers favor a product or practice, and only rivals squawk, the most natural inference is that the complained-of practice promotes rather than undermines competition.").

Google never even *suggested* that it would withhold its product unless Apple or Mozilla refrained from distributing rivals—much less took any steps in that direction. Indeed, withholding Google Search would not have prevented Apple from offering Safari with a rival GSE as the out-of-the-box default. Apple simply chose not to do so because it would have made less money and delivered users an inferior Safari experience. *See* JA__[Liab.Tr.2530] (Cue) ("I called all these other search providers…. But I didn't see anything on the horizon that was going to be

---

conduct like all-or-nothing demands—which is absent here. Whatever might be said about, for example, anticompetitive product redesign (*Microsoft*, 253 F.3d at 65) or predation (*id.* at 68), Plaintiffs did not invoke (and could not have proven) such theories.

better…than Google's, and Microsoft certainly wasn't it."). Mozilla actually *did* exercise its free choice to switch to Yahoo! for Firefox's out-of-the-box default for *years*, and Google continued making Search available to Mozilla and Firefox users during that time. *See* JA__[Liability.Op.116]*.

Nor did Google press browser-makers to forebear from promoting rivals. To the contrary, the browser agreements permit Apple to *promote* rivals via bookmarks on the Safari homepage, which Apple does. JA__[Liability.Op.110]*. Mozilla offers the "this time, search with" feature in Firefox, promoting options such as Bing, Amazon, and DuckDuckGo. JA__[Liability.Op.25]*. For example:



JA__[DXD-37.049].

Nor did Google muscle its way to an all-or-nothing deal—say, by refusing to pay revenue share on *any* access point unless it was the default GSE for *all* access points. Quite the opposite. Google's "global agreement" with Apple "carved out" "countries where [Apple] found that either Google wasn't the best [GSE] or there was another [GSE] that [Apple] thought was very competitive." JA__[Liab.Tr.2477] (Cue). "In the countries where Google was providing the best experience," Apple made Google the default, but "[i]n the countries where they were not," Apple made a different GSE the default. JA__[Liab.Tr.2476-2477] (Cue); *see* JA__[JX33] (not encompassing these queries). Google's payments followed what Apple did—it did not pay revenue share on Safari in those other countries, but continued paying revenue share on queries in the U.S. JA__[Liab.Tr.2478-2479] (Cue).[9]

---

[9] To the extent Apple and Mozilla decided not to carve their agreements up by device and browsing mode, or carve Google out in other ways, that was a function of how Apple and Mozilla chose to design their browsers and negotiate with Google. *See supra*, pp. 11-20. Antitrust analysis "cannot ignore the demands of the marketplace in which these agreements arose." *NicSand, Inc.* v. *3M Co.*, 507 F.3d 442, 454 (6th Cir. 2007) (en banc) (affirming judgment for defendant in exclusive dealing case). "If the buyers in a market demand one thing, the antitrust laws do not prohibit an [alleged monopolist] from offering that same thing." *Id.* at 453. Where Google was "merely offering" browsers an arrangement that they "already insisted on receiving," making the best offer to "win [their] business does not offend the antitrust laws, much less undermine the competitive environment those laws were designed to foster." *Id.* at 452-53; *cf. Malheur Forest Fairness Coal.* v. *Iron Triangle, LLC*, 164 F.4th 710, 726 (9th Cir. 2026) (winning what was "necessarily an exclusive contract" did not exclude competition).

- 63 -

The only statements from the district court that might be misunderstood as a finding of coercion by Google relate to the corporate doublespeak that "Apple sought greater flexibility" in its contracts with Google.  JA__[Liability.Op.110]*. In the first place, this observation is irrelevant because it concerned negotiations back in 2009 and 2012—years before the time period at issue for liability, *see* JA__[Liab.Tr.6037-6039] (Whinston); JA__[Liab.Tr.7243-7244] (Baker)—and nothing similar occurred during the period when Google supposedly monopolized.

More fundamentally, what Apple wanted in those early years wasn't "flexibility"—it wanted money for nothing: "[t]he option but not the obligation to set Google as the default search provider" *and still be paid revenue share from Google*.  JA__[Liability.Op.110]* (citation omitted).  That is, under Apple's proposal, "Apple would have [n]o obligation to use Google search services or to make Google the default while maintaining its then-revenue share of 50% for all Google searches on Apple devices."  JA__[Liability.Op.110]* (citation omitted). Google would have paid revenue share whenever the *user* of an Apple product *chose* to query Google—say, by entering "google.com"—and Apple would have had no promotional or other obligations to Google in return.

Google quite reasonably—and lawfully—declined to fork over revenue from queries that Apple had no role in promoting.  It is one thing to say that the antitrust laws bar a monopolist from demanding terms that prevent a customer from

- 64 -

choosing a better deal. It is quite another to say that a monopolist must accept whatever deal the customer demands. "The customer is always right" is an especially nonsensical test where, as here, no rival proposed or accepted such terms. Rather, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448. If refusing a counterparty's demands for money for nothing is an antitrust violation, then any company with a large market share will enter every negotiation in a perilous fog. What would Google have had to cede to Apple to avoid liability? Plaintiffs never said, the court below never spoke to it, and other companies will never know. *See Town of Concord*, 915 F.2d at 22 (Breyer, J.) (antitrust rules "must be clear enough for lawyers to explain them to clients").

Even if the district court's other statements about the 2009 and 2012 Google-Apple negotiations were relevant, they are likewise unsupported by the record. The court stated that Google rejected Apple's demands because "'[i]f they wanted to receive revenue share,' Apple had to maintain Google as the exclusive Safari default." JA__[Liability.Op.110] (quoting JA__/Liab.Tr.5001:8-11 (Braddi)). But the testimony cited to support that assertion reflects no such ultimatum:

> Q. But, ultimately, Apple's obligation to make Google the default in Safari, that remained in place, right?

- 65 -

A. If they wanted to receive revenue share, yes, benefit of the bargain.

JA__[Liab.Tr.5001:8-11] (Braddi).  That testimony described the contractual "obligation" on which Apple and Google agreed, not a negotiating insistence that Google be set as a universal default for Apple to receive any revenue share on any default.  Indeed, the same witness later explained:  "Google refused to go along with a deal that would involve paying a rev share, but no obligation to be set as the default" because that "essentially allowed" Apple "to impose a tax on any Google traffic on the platform."  JA__[Liab.Tr.5070] (Braddi).  Contemporaneous documents on which the district court relied corroborated that testimony.  *See* JA__[UPX605.7] ("Apple's terms attempt to impose a tax on Google").

Nor did anything support the district court's belief that Google "rejected" Apple's proposed "terms in large part because Apple 'could decide to work with an alternate provider for the desktop/Safari search solution,' i.e., use Google as the default for some, but not all, locations or product lines/versions." JA__[Liability.Op.110]* (quoting JA__/UPX605.270).  That scrambles the words of the document to mean the opposite of what they say:

- 66 -

### Recommendations & Options

| Options | Rationale |
|---|---|
| • Agree to Apple's terms<br> ○ NOT recommended<br>• Maintain hardware deal "as is"<br> ○ 50% after 10% costs<br> ○ NOT recommended<br>• Adjust existing deal with reduced revenue share terms<br> ○ 35% - 40% after 10% costs<br>• Do not adjust the mobile deal until we get closer to deal expiration<br> ○ Recommended<br>• Are we prepared to walk? | • The current desktop deal pays AAPL more than 100% of incremental revenue<br> ○ Lower revenue share is justified<br>• Apple's terms attempt to impose a tax on all Google.com revenue through Safari and their devices |

| Issues / Risks |
|---|
| • AAPL could decide to work with an alternate provider for the desktop / Safari search solution |

CONFIDENTIAL – FOR INTERNAL USE

Contrary to the district court's statement about Google's reasons, the "Rationale" for rejecting Apple's terms was that "[t]he current desktop deal pays [Apple]" an economically unjustifiable amount, and that Apple was "attempt[ing] to impose a tax on all Google.com revenue" (just as Google's witness testified). The document further points out that Apple "work[ing] with an alternate provider" was among the "*Issues/Risks*" of rejecting Apple's terms—not, as the district court stated, a *reason* for rejecting them. That document thus reflects the unexceptional—and starkly competitive—recognition by Google that Apple was driving a hard bargain, and if

- 67 -

Google did not accede to Apple's terms, then Apple might go elsewhere for a better deal.  That is the opposite of *preventing* Apple from taking a better offer.

***

Because Google's browser agreements did not harm the competitive process, they were lawful, full stop.  *EpiPen*'s summary is apt:  "[I]n the absence of any coercion," the record leads to the "the firm and singular conclusion" that rivals "need[ed] only offer a better product or a better deal" to compete.  44 F.4th at 989 (citation omitted).  Here, Google's rivals didn't make a better GSE or offer a better deal.  Microsoft's investment of billions in OpenAI nonetheless has propelled the emergence of ChatGPT—the leader among GenAI chatbots that "pose a threat to the primacy of traditional internet search."  JA__[Remedies.Op.127]*.  Google's rivals ultimately succeeded by building something new that consumers wanted.  That is the competitive process at work.

### 3. The Browser Agreements Were Not Exclusive Dealing Agreements in the First Place, Independently Requiring Judgment for Google

As just discussed, the browser agreements were lawful regardless of how they were labeled.  But the district court's starting point—labeling them "exclusive deals"—was also wrong, and an independently sufficient reason for reversal.  Here again, the court applied an incorrect legal standard, and it again relied heavily on after-the-fact user behavior (and market outcomes that behavior produced),

- 68 -

ignoring the terms of the agreements themselves. The court's approach would cast doubt on many lawful agreements and make it impossible for businesses to judge *in advance* whether their agreements might be unlawful.

**a.**    The judgment can be defended only on the theory that Plaintiffs' claims are unlawful exclusive dealing because that is the only theory the plaintiffs pursued at trial. JA__[Liability.Op.203]* (rejecting Plaintiffs "dramatic post-trial" effort to walk away from their exclusive-dealing theory of the case). "[A] prerequisite to any exclusive dealing claim is an agreement to deal exclusively." *ZF Meritor*, 696 F.3d at 270. An exclusive dealing agreement requires one party to deal with the counterparty *and not with rivals*. *See id.* ("An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time."); *Antitrust Law* ¶ 1800a ("exclusive-dealing arrangement is a contract" that "*forbids* the buyer from purchasing the contracted good *from any other seller*") (emphasis added).

Thus, in *Microsoft*, Microsoft's agreement with AOL was exclusive because it *prohibited* AOL from "promot[ing] any non-Microsoft browser" or "provid[ing] software using any non-Microsoft browser except at the customer's request," and went further still, providing that "even then AOL will not supply more than 15% of its subscribers with a browser other than" Microsoft's Internet Explorer. 253 F.3d

- 69 -

at 68.  The agreement was exclusive because it contractually *restrained* AOL from fulfilling demand for Microsoft's rivals' products.

Conversely, an agreement that *permits* a counterparty to deal with rivals cannot be exclusive.  Thus, this Court held that an "exclusive dealing theory fails as a matter of law" where the conduct of the defendant (Facebook) "leaves app developers entirely free to develop applications for Facebook's competitors." *Meta Platforms*, 66 F.4th at 304.

**b.**    Google's browser agreements were not exclusive because they left Apple and Mozilla free to promote and meet users' demand for rival GSEs—and, indeed, Apple and Mozilla did so.

Apple "reached agreements with Bing and Yahoo for bookmark placement" on Safari, in "promotional agreement[s]."  JA__[Liability.Op.111]*.  Under those promotional agreements, "Bing and Yahoo are preloaded as default bookmarks on Safari's homepage."  JA__[Liability.Op.208]*.  Firefox has a "this time, search with" feature.  JA__[Liability.Op.25]*; *see supra*, p. 62 (depicting this).  And "[o]n all major browsers, users can navigate to the browser's settings and change the default" search bar to certain preset rival GSEs with just a few clicks. JA__[Liability.Op.25]*.  And anyone can type "bing.com" or otherwise navigate to their preferred GSE.  JA__[Liability.Op.24]*.

Nor did the browser agreements restrict behavior outside of Safari and Firefox. Google's agreement with Apple did not restrict Apple from preinstalling, promoting, or distributing an additional search application or browser that defaults to a rival GSE. JA__[Liability.Op.207]*.

**c.** The district court conceded that the browser agreements had "no express exclusivity provision," JA__[Liability.Op.207]*, and that "[u]sers are free to navigate to Google's rivals through non-default search access points," JA__[Liability.Op.209]*. So they were not unlawful. But the court went on to offer shifting explanations for how the agreements should nonetheless be deemed exclusive—the sort of inconsistency and confusion that disserves the Supreme Court's principle that "antitrust rules must be clear enough for lawyers to explain them to clients," *linkLine*, 555 U.S. at 453 (citation modified). And each explanation was legally wrong.

*First*, the district court at times stated that "Google's browser agreements are exclusive insofar as they establish Google as the out-of-the-box default search engine." JA__[Liability.Op.204]*. But that cannot define exclusivity in a case where "Plaintiffs are not challenging the concept of a search default or that distributors may recommend a search engine [or] set a search default." JA__[Liability.Op.249]*. Once a browser-maker decided to design its browser with a default, at most one GSE could be set as the out-of-the-box default. *See*

*supra*, pp. 11-14.  There is no more legal significance to calling an agreement to share revenue generated from that single position "exclusive" than to calling an agreement to purchase a specific tract of land "exclusive."  "[V]irtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market, namely the portion consisting of what was bought."  *Barry Wright Corp.* v. *ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.).

*Second*, the district court also suggested that Google's agreements were exclusive notwithstanding that "[u]sers are free to navigate to Google's rivals through non-default search access points," because "they rarely do." JA__[Liability.Op.209]*.  But when it comes to users, the legally relevant question is what those users are free do to, not what they do with that freedom. "[E]xclusivity" must depend on an agreement's "actual terms," *Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016), not on hindsight behavioral studies of how consumers act (a nebulous approach that the district court erroneously labeled "de facto exclusivity").  Otherwise, whether contracts are exclusive would unpredictably vary depending on other parties' independent choices.  And equating positive customer response with exclusivity would lead to the perverse result that agreements to promote products that customers *prefer* will be *more* likely to be held to be unlawful.

The district court vividly illustrated the point when it found "that defaults are less effective when the alternative has strong brand recognition and product quality" and "stronger when the user is satisfied with the product." JA__[Liability.Op.28, 208]*. "Google's brand recognition and Yahoo's poor quality were major factors that dampened the default effect on Firefox" when Mozilla set Yahoo! as the default. JA__[Liability.Op.208]*. Conversely, "Google's search share on Windows devices is 80%," even where Bing is the default GSE on the only preinstalled browser, Edge. JA__[Liability.Op.32]*. Those findings leave no doubt that users find their way to the GSE they prefer, whether or not it is preset as the default—confirming that that defaults are promotional tools, not exclusionary exclusivity conditions.

*Third*, the district court elsewhere suggested that the browser agreements were exclusive because they provided for Google to be the default GSE across *all* access points for a particular browser. *See* JA__[Liability.Op.204]* ("The Apple ISA requires that Google be preloaded as the exclusive default search engine on all Safari search access points"); JA__[Liability.Op.205]* ("Google is the default GSE on all Firefox search access points."). As set out above, *supra*, p. 63, that assertion was incorrect because Google's agreement with Apple "carved out" Apple's ability to set a different out-of-the-box default GSE in certain countries.

Regardless, the focus of the browser agreements cannot signal exclusive dealing:  Any contract covers 100% of what it covers, and it was *the browser-makers themselves* that designed their products to offer uniform defaults and demanded that GSEs bid for the right to be that single default.  *See supra*, note 9. Nobody has explained why the antitrust laws required Google to insist on separately negotiating for out-of-the-box default placement (in some indeterminately granular tranches) when neither Apple nor Mozilla asked for that. And it would be the height of formalism to hold Google liable for failing to do so when Plaintiffs conceded, and the district court found, that Google would have won every access point if it negotiated them separately because it offered the best product at the best price.  *See, e.g.*, JA__[Liab.Tr.2183, 2208, 2212] (Plaintiffs' expert Chipty); JA__[Remedies.Op.76, 121-22]*.

***

Plaintiffs' failure to show that the browser agreements were exclusive dealing is thus an independent basis for judgment in Google's favor.

### 4. The Android Agreements Cannot Alone Sustain Liability for Monopolization

Accepting any of the arguments above about the browser agreements ends this case.  The district court identified no conduct involving the ads market that

- 74 -

could be exclusionary.[10]  That leaves only Google's conduct with respect to

Android mobile devices.  Whatever one might say about the Android agreements,

they did not affect enough of the market to be unlawful.[11]

"[C]ourts considering antitrust challenges to exclusive contracts have taken

care to identify the share of the market foreclosed." *Microsoft*, 253 F.3d at 69.

Thus, even "an exclusive deal affecting a small fraction of a market clearly cannot

have the requisite harmful effect upon competition." *Id.*  Foreclosure is a threshold

screen, and "low numbers make dismissal easy." *Stop & Shop Supermarket Co.* v.

*Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (Boudin, J.).

Here, "[l]ow numbers" compel judgment for Google.  The Android

agreements cover, at most, 19% of GSE queries.  JA__[Liability.Op.25]*.  That

does not foreclose rivals from a "substantial percentage of the available

---

[10] The district court's finding that "the cost-per-click for a text ad has grown over time," JA__[Liability.Op.259]*, cannot stand in as exclusionary conduct.  That finding is, at most, partial information about Google's market power, because it says nothing about whether the *value* of those clicks to advertisers has also grown, such that advertisers were actually getting a better deal.  And the finding says nothing about the conduct that was the *source* of any such market power—and "mere possession of monopoly power, and the concomitant charging of monopoly prices, is…not unlawful." *Trinko*, 540 U.S. at 407.

[11] At the very least, this case would be unrecognizable and require analysis from scratch if it were predicated on the Android agreements alone.  The conclusions about anticompetitive effects below depend on "[a]ggregating the foreclosure effects of the browser and Android agreements"; there are *no* findings about the standalone effects of the Android agreements.  JA__[Liability.Op.222]*.

opportunities." *Microsoft*, 253 F.3d at 70. Although *Microsoft* does not itself set a numerical floor, other Section 2 courts have consistently set thresholds well above 19%. *See, e.g.*, *OJ Com., LLC* v. *KidKraft, Inc.*, 34 F.4th 1232, 1250 (11th Cir. 2022) (rejecting Section 2 liability) (requiring "at least 40%"); *EpiPen*, 44 F.4th at 988 (same) (no substantial foreclosure from practices affecting "31% of the U.S. population").

Moreover, coverage is only the beginning of identifying substantial foreclosure. *See Barry Wright*, 724 F.2d at 237-38. Plaintiffs did not prove, and the district court did not find, what Android queries would have gone to Google's rivals absent the objected-to terms in those agreements. Users can and do switch the default GSE on Android. *See* JA__[Liability.Op.28]*. And very few Android users might have preferred a different default on those devices. *See, e.g.*, JA__[Remedies.Op.190-91]* ("The European Commission has mandated the display of choice screens on Android devices since 2020, yet there has been little shift in market share away from Google."); JA__[Liability.Op.46]* (quoting T-Mobile testimony) ("Google 'provides customers with the best overall device experience'"). That makes sense: Users of Google's flagship mobile operating system would naturally have a strong preference for Google Search, the highest quality and most popular search engine.

### B. The District Court's Finding of Monopoly Power Rests on the Legal Error of Ignoring Competitive Constraints on Google, Independently Requiring Judgment for Google

However the relevant markets are defined, Google's conduct was lawful. But the district court's misconception of the market in which Google competes for queries—the only market in which the district court found exclusionary conduct—independently warrants reversal. Under the correct legal standards for market definition, the court's own findings show that GSEs that answer users' queries compete commercially in the same markets as other products that answer similar kinds of user queries, particularly SVPs like Amazon and Expedia. Google indisputably lacks monopoly power in that market.

#### 1. Market Definition Requires Attention to "Commercial Realities" and What Products Are "Reasonably Interchangeable"

"[P]ossessing monopoly power…is a necessary element of a monopolization charge." *Microsoft*, 253 F.3d at 51. Monopoly power is the power to "restrict output" to "force a purchaser to do something that he would not do in a competitive market." *Eastman Kodak*, 504 U.S. at 464 (citations omitted). A defendant that lacks that power cannot unilaterally harm the competitive process. A court must therefore define the market and assess the defendant's power in it: "Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Walker Process*, 382 U.S. at 177.

- 77 -

"The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output."  *Geneva Pharms. Tech. Corp.* v. *Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).  Indeed, "[w]hether considered in the conceptual category of 'market definition' or 'market power,'" the "ultimate inquiry" is the same:  whether other firms constrain the defendant from requiring customers to abandon a better offer instead of trying to make them a better offer.  *Eastman Kodak*, 504 U.S. at 469 n.15.  Two principles are particularly important for identifying those constraints.  *First*, the relevant market must "reflect[] commercial realities."  *Ohio* v. *American Express Co.*, 585 U.S. 529, 544 (2018) (citation omitted); *see Eastman Kodak*, 504 U.S. at 467 ("[T]his Court has examined closely the economic reality of the market at issue.").  *Second*, the "relevant market *must* include all products reasonably interchangeable by consumers for the same purposes."  *Microsoft*, 253 F.3d at 51-52 (citation modified).

### 2. The District Court's Own Findings Required Including General Search Engines and Specialized Vertical Providers in the Relevant Markets

The district court's findings show that Google (like other GSEs) answer all queries for free as a strategy to compete against SVPs.  Google "seeks to attract users on the promise that it will accurately and efficiently answer any query and monetize the commercial ones through advertising."  JA__[Liability.Op.142]*.

- 78 -

Google earns nothing for the 80% of queries that "are noncommercial in nature." JA__[Liability.Op.17]*.  Rather, Google "make[s] money by selling digital advertisements" on the other 20%.  JA__[Liability.Op.1, 17]*.

SVPs compete directly for those commercial queries, for which they also sell advertisements (and also sell the advertised product).  Thus, "an SVP can serve the same purpose as a GSE for an individual query on a particular subject matter." JA__[Liability.Op.147]*.  "A user can, for example, use either Google or OpenTable to find a nearby Japanese restaurant, or turn to Google or Amazon to shop for a blender."  JA__[Liability.Op.147]*.

SVPs therefore "can and do compete with GSEs for certain types of queries."  JA__[Liability.Op.151]*.  Indeed, that "competition" is "intense." JA__[Liability.Op.53]*.  It constrains Google to seek users' favor rather than act against their interests:  Google "perceive[s] and respond[s] to competitive pressure from other platforms, particularly SVPs" by, for example, "develop[ing] verticals like shopping, flights, and hotels in part to provide users with topic-specific results much like SVPs."  JA__[Liability.Op.147]*.

In short, when it comes to queries, the district court found that SVPs and GSEs can be used "by consumers for the same purposes"; under this Court's precedent the "relevant market *must* include" all those substitutes.  *Microsoft*, 253 F.3d at 51-52 (citation modified).  And the court found that consumers' ability to

substitute SVPs has driven Google to innovate in ways that benefit consumers.

Those "commercial realities," *Amex*, 585 U.S. at 544, and "competitive pressures,"

*Geneva Pharms.*, 386 F.3d at 496, unambiguously establish that GSEs and SVPs

compete in the same markets.  The market defined below was therefore legally

incorrect, as was any conclusion that Google has any power to earn more by giving

consumers less.  *See Eastman Kodak*, 504 U.S. at 469 n.15.

> **3.      The District Court's Basis for Separating General Search
> Engines and Specialized Vertical Providers Was Legally
> Unsound**

Ignoring those competitive constraints, the district court held that GSEs and

SVPs belong in different markets because they have different "business models"—

GSEs answer *all* queries, while SVPs focus only on certain commercial queries.

JA__[Liability.Op.142]*.  That was error.

**a.**      No precedent exists for putting interchangeable products in different

markets because their producers have different "business models."  To the

contrary, even products from two different *industries* belong in the same market if

the products compete.  *United States* v. *Continental Can Co.*, 378 U.S. 441 (1964).

In *Continental Can*, "the interindustry competition between glass and metal

containers [wa]s sufficient to warrant treating as a relevant product market the

combined glass and metal container industries and all end uses for which they

compete."  *Id.* at 457.  Although "glass and metal containers have different

- 80 -

characteristics which may disqualify one or the other…from this or that particular use," that was "not sufficient to obscure the competitive relationships which th[e] record so compellingly reveal[ed]." *Id.* at 450; *see, e.g.*, *DSM Desotech Inc.* v. *3D Sys. Corp.*, 749 F.3d 1332, 1339 (Fed. Cir. 2014) ("When products are not identical or fungible, they still may be in the same market as differentiated products."); *AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999) ("products or services need not be identical to be part of the same market").

Looking to differences in "business models" to define a market was especially inapt given that differentiation is often the very way that firms compete in the same product market. *See Amex*, 585 U.S. at 538 (noting that American Express competes with Visa and MasterCard "by using a different business model"). For example, firms that distribute directly to consumers can compete with companies that use dealers. Firms that own their retail outlets can compete with those that use a franchise model. Online stores compete with brick-and-mortar stores. Indeed, the district court's findings at the remedies stage offer a complete rebuttal to its own market definition at the liability stage: The court found that GenAI chatbots exert competitive pressures on GSEs even though they "have many use cases that traditional GSEs do not," JA__[Remedies.Op.25]*, and

- 81 -

that "[t]echnological advancement and *product differentiation* are what will change market dynamics," JA__[Remedies.Op.221]* (emphasis added).

**b.**    The district court's invocation (JA__[Liability.Op.140-46]*), of the "practical indicia" from *Brown Shoe Co.* v. *United States*, 370 U.S. 294 (1962), cannot justify its market definition here.

This Court has understood the *Brown Shoe* "indicia" as "evidentiary proxies for direct proof of substitutability." *Rothery Storage & Van Co.* v. *Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986) (Bork, J.).  Like any proxy, those "indicia" have their limits.  *See Reifert* v. *South Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006) ("While the 'practical indicia' named in *Brown Shoe*…are important considerations in defining a market, they were never intended to exclude economic analysis altogether."); *cf. FTC* v. *Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1055-59 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) ("[T]he practical indicia test of *Brown Shoe*…does not sufficiently account for the basic economic principles that, according to the Supreme Court, must be considered under modern antitrust doctrine.").

In particular, the *Brown Shoe* factors are not a license to define markets by asking in the abstract whether products are "enough alike" in some gestalt sense. And they certainly cannot be used to *disregard* direct evidence of consumer substitution and commercial realities that reveal competitive constraints.  But that

is exactly what happened below.  Plaintiffs proffered *no* quantitative evidence of how often users switch between GSEs and SVPs, which even the district court found "surprising."  JA__[Liability.Op.139]*.  In contrast, Google's uncontested evidence showed that users switch from Search to SVPs frequently—even more often than they switch from Search to Bing—which suggests that SVPs are at least as "reasonably interchangeable by consumers" for Search as other GSEs.  *Microsoft*, 253 F.3d at 51-52; *see* JA__[Liab.Tr.2363] (Giannandrea); JA__[Liab.Tr.8411] (Israel); JA__[DXD-29.020-29.021].  But the district court ignored that evidence in favor of a metaphysical inquiry into "features of a GSE that make it distinct from other platforms."  JA__[Liability.Op.140]*.

The district court even misapplied *Brown Shoe* itself by declining to "consider [*Brown Shoe*'s] factors related to pricing" because "general search is a free product."  JA__[Liability.Op.140]*.  Nobody is in business simply to give a product away.  That is why *Amex*—the Supreme Court's latest word on market definition—held that courts cannot define the market in which a firm competes without accounting for how the firm earns money.  *See* 585 U.S. at 547.  The Supreme Court could hardly have been clearer that it was legal error to define a market involving merchants alone because American Express "cannot make a sale unless both [cardholders and merchants] simultaneously agree to use [its] services."  *Id.* at 545.  The market structure is different here, but the larger lesson is

- 83 -

the same:  The fact that Google does not charge users for queries was a critical clue that the "commercial realities" of the market must lie elsewhere—in competition against SVPs to serve the only queries that *do* generate revenue.  Rather than accept that commercial reality about commercial queries, the district court unaccountably gave controlling significance to how GSEs and SVPs treat *noncommercial* queries differently.

### 4.    Correcting the District Court's Erroneous Market Definition Requires Judgment for Google

As just explained, GSEs and SVPs compete in the same relevant markets. There is no claim that Google possesses monopoly power in any such broader market, so it cannot be liable for monopolization.  *See* JA__[Liability.Op.136-37, 147]*.

Google's lack of monopoly over user queries also means it cannot have monopolized the related market for general search text advertising.  The market for those ads is derivative of the market on the user side; "[a]dvertisers will go to whichever GSE wins the competition for queries."  JA__[Remedies.Op.167]*.  If Google lacks monopoly power over users' queries, then it also lacks monopoly power over advertising displayed in response to those queries.

***

At each independent step of the analysis, the district court held Google's success against it, treating marketplace success as evidence of unlawful

- 84 -

monopolization.  That is a recipe for punishing the most successful firms while failing to provide clear rules for how businesses can conform their conduct to the law.  But the district court's approach is not the law.  On the court's own findings, Google did nothing unlawful.  It was not a monopolist, because it could succeed only by competing for queries against a broader market of SVPs.  Its browser agreements were not exclusive, because they did not restrict browser-makers' dealings with rivals.  And its conduct was not exclusionary because it won on the merits by offering browser-makers the benefit of its efficient, high-quality, profitable GSE.  On any one of those grounds, the judgment must be reversed.

## II.     The District Court Abused Its Remedial Discretion by Failing to Apply the Correct Legal Standards

Even if the liability decision stands unmodified, this Court should strike the district court's data-transfer and syndication remedies.  Those remedies cannot be justified under existing law, and they certainly cannot be extended to aid GenAI products, which could not have been affected by Google's challenged conduct, were not in the relevant market defined by the district court, and have been wildly successful all on their own.

### A.     Antitrust Remedies Must Be Tailored to the Causal Connection Between the Defendant's Anticompetitive Conduct and Its Market Position

As a baseline, "the antitrust defendant's unlawful behavior should be remedied by an injunction against continuation of that conduct." *Microsoft*, 253

F.3d at 106 (citation modified). And Google, if it had violated the law, would not

challenge remedies of that character. To justify moving beyond that remedial

baseline, a court must aim to restore something lost as a result of the defendant's

wrongdoing. "Remedies generally seek to place the victim of a legal wrong…in

the position that person would have occupied if the wrong had not occurred."

*Babb* v. *Wilkie*, 589 U.S. 399, 413-14 (2020) (citation omitted). "The scope of the

remedy must be proportional to the scope of the violation, and the order must

extend no further than necessary to remedy the violation." *Brown* v. *Plata*, 563

U.S. 493, 531 (2011).

Consistent with those principles, an antitrust injunction's "purpose" is to

"cure the ill effects of the illegal conduct." *United States* v. *Glaxo Grp. Ltd*., 410

U.S. 52, 64 (1973). It "should be tailored to fit the wrong creating the occasion for

the remedy." *Microsoft*, 253 F.3d at 107.

Section 2 remedies do not aim to eliminate the defendant's monopoly

(unless the market itself would have eliminated that monopoly but for the

defendant's unlawful conduct). Regulatory statutes that seek "*to eliminate the*

*monopolies*" in certain industries are "much more ambitious than the antitrust

laws," which "seek[] merely to prevent *unlawful monopolization*." *Trinko*, 540

U.S. at 415 (citation omitted). "It would be a serious mistake to conflate the two

goals." *Id.* Thus, the "[m]ere existence of an exclusionary act does not itself

justify full feasible relief against the monopolist to create maximum competition."
*Microsoft*, 253 F.3d at 106 (citation omitted).  "[J]udges" lack "*carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition."  *Trinko*, 540 U.S. at 415-16.

Where a defendant has become the market leader through innovation, remedies directed at breaking up the defendant's monopoly—through a literal breakup or forced sharing of its advantages—are improper because they would wrongly "confiscate much of the value of [the defendant's] investment." *Massachusetts*, 373 F.3d at 1230.  To avoid seizing the regulatory policymaking role that belongs to the political branches, courts must tailor antitrust injunctions to the effect of the defendant's *unlawful* conduct on its market position.  "In devising an appropriate remedy," courts must "consider whether plaintiffs have established a sufficient causal connection between [the defendant's] anticompetitive conduct and its dominant position in the [relevant] market."  *Microsoft*, 253 F.3d at 106. "Absent such causation, the antitrust defendant's unlawful behavior should be remedied by an injunction against continuation of that conduct."  *Id.* (citation modified).

Overall, "caution is key."  *NCAA* v. *Alston*, 594 U.S. 69, 106 (2021). "[M]arkets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare."  *Id.*  Antitrust "decrees themselves may

unintentionally suppress procompetitive innovation." *Id.* at 102-03. Special caution is required for "forward-looking" remedies prohibiting "conduct as to which there has not been a violation of the law," for in those circumstances, there are no "liability findings to mark the way." *Massachusetts*, 373 F.3d at 1223-24.

### B. The District Court Never Made the Findings Legally Required to Support the Heightened Remedies of Data-Transfer and Syndication

The district court was anything but cautious when it ordered Google to aid its competitors through the data-transfer and syndication remedies. It never found what effect (if any) Google's conduct had on the market, and thus it lacked a basis to ensure that its injunction would restore what Google's supposed wrongdoing took away, rather than confiscate what Google had lawfully achieved.

1.    The district court's limited findings on liability required it to separate the effects of lawful conduct from unlawful conduct at the remedies stage.

The district court recognized as much, stating that it could "dispatch with the notion that the distribution agreements were the sole reason Google maintained its monopoly," JA__[Remedies.Op.77]*, and that "the record…contains ample evidence that *lawful* conduct played an important role in Google's maintenance of its monopoly." JA__[Remedies.Op.115]* (emphasis added). "That includes [Google's] best-in-class search quality, consistent innovations, investment in

human capital, strategic foresight, and brand recognition," whose "contribution…to Google's success is not disputed." JA__[Remedies.Op.115]*.

Having made those findings, the district court was obliged to assess the particular effects of Google's supposed unlawful conduct on its market position. *See Massachusetts*, 373 F.3d at 1232 ("the fruits of a violation must be identified before they may be denied"). The district court agreed in theory that "[c]ausation plays an important role in calibrating the scope of a remedial decree. The relief granted should not 'exceed[] evidence of a causal connection' between the defendant's anticompetitive behavior and its dominant position in the relevant market." JA__[Remedies.Op.63]* (quoting *Massachusetts*, 373 F.3d at 1234).

2.    But the district court never made the findings needed for that calibration. The court acknowledged that it "did not make factual findings [at the liability stage] with an eye towards meeting a stricter remedies causation standard—that was not the task at hand." JA__[Remedies.Op.75]*. Rather, because it had applied the "'edentulous' causation standard at the liability stage," it was inappropriate to "simply pluck sentences from the liability opinion" to justify particular remedies. JA__[Remedies.Op.75]*.

And yet, at the remedies stage, the court never made findings that it acknowledged were lacking at the liability stage: findings about what ground (if any) Google's rivals would have gained absent Google's supposed unlawful

conduct.  Plaintiffs tried, but the court *rejected* their expert's "share-shifting exercise" as "too speculative and not grounded in realistic assumptions about market behavior."  JA__[Remedies.Op.120] n.11*.  If anything, the court suggested that Google would have won the same out-of-the-box default positions even if contracts had been structured differently.  *See* JA__[Remedies.Op.76]* ("Google points out that Plaintiffs offered no evidence that any browser developer, OEM, or wireless carrier wanted to set any GSE other than Google as the preloaded default.").

> **3.** The district court excused a lack of causation findings because it believed that making them would be too difficult.  "[R]econstruct[ing] the but-for world would require the court to determine how Google Search and its rivals would have evolved had Google not secured exclusive default placement for more than 10 years," posing an "evidentiary predicament."  JA__[Remedies.Op.68]*.  That was legally unsound.

To begin, gauging what would have happened without Google's supposed unlawful conduct was not nearly so challenging or exotic as the court thought.  Google's customers testified, based on more than a decade of negotiations, about what drove their behavior.  Apple's executive could not have been clearer:  There was "no price" that Microsoft could have paid to win the default because Google's

- 90 -

product was so much better and Microsoft's monetization was so poor. *See supra*, pp. 17-18.

More generally, analysis that seeks to separate the effects of unlawful conduct from lawful competition is not a frontier academic exercise, but workaday antitrust practice. For example, "[t]he antitrust plaintiff must measure its antitrust damages by comparing its actual economic condition to what its condition would have been 'but for' the unlawful behavior of the defendant(s)." *Antitrust Law* ¶ 392e; *see Concord Boat Corp.* v. *Brunswick Corp.*, 207 F.3d 1039, 1053 (8th Cir. 2000). Plaintiffs' "evidentiary predicament" was that evidence supporting their remedial proposal did not exist here, not that such evidence could never exist anywhere.

This Court has held that these central precepts from damages practice are "instructive" with regard to injunctive relief, and are why a "causal connection" must be found. *See Microsoft*, 253 F.3d at 104-05 (citing *Concord Boat*, 207 F.3d at 1053-54). Just as an antitrust plaintiff can recover damages only for injuries "attributable to an anti-competitive aspect of the practice under scrutiny," *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 334 (1990), so too a plaintiff may obtain an injunction only for the effects of the conduct held unlawful. An injunction must be "tailored to fit the wrong," and tailoring starts with measurement. *Microsoft*, 253 F.3d at 107.

- 91 -

Google's objection was not an impossible demand for "mathematical precision." JA__[Remedies.Op.97]*. This is not a case where Plaintiffs proved that, but for unlawful conduct, Google would have lost significant market share, even if they could not say how much with decimal precision. Rather, there was no evidence and therefore no finding that *any* portion of Google's market share would have been lost but for unlawful conduct. To the contrary, the court's only findings about the reasons for Google's market-leading position were that Google earned it *lawfully* as early as 2009, when it had 80% market share. JA__[Remedies.Op.76, 108]*; JA__[Liability.Op.13]*.

    **4.** In lieu of the required causation finding, the district court based its sweeping injunction on a self-assessment of its "confidence" in its liability-stage findings. It held that "the applicable causation standard reflects the court's level of confidence that the challenged conduct significantly contributed to the defendant's maintenance of its monopoly." JA__[Remedies.Op.73]*; *see* JA__[Remedies.Op.77]* ("The question, then, is how much confidence the court has in that assessment."). Because its "liability determination was supported by more than the barest of inferences," "[t]he court [wa]s thus satisfied that its liability findings support…some of the proposed behavioral remedies." JA__[Remedies.Op.81-82]*; *see* JA__[Remedies.Op.130]* (justifying data-transfer); JA__[Remedies.Op.170-71]* (justifying syndication).

That novel approach to calibrating remedies was wrong—legally, logically, and practically. No precedent attaches remedial significance to a court's subjective "confidence" in its liability determinations. Courts make findings and apply the law. Here, the district court did not make the findings *Microsoft* demands before imposing remedies beyond enjoining continuation of the conduct held unlawful.

Nor can "confidence" be a logical substitute for findings about causation-in-fact needed to justify and calibrate a remedy that goes well beyond enjoining the conduct held unlawful. A court with 80% confidence that the supposed exclusionary conduct captured 5% of the market should order a different remedy from a court with 80% confidence that conduct captured 45% of the market. But the district court's approach would justify the same remedy in either situation so long as "the court's liability determination" was "supported by more than the barest of inferences" with similar "confidence." JA__[Remedies.Op.77, 81]*.

The district court's approach also stymies appellate review of remedies. How in practice can one challenge a district court's subjective "confidence"? More to the point, if the district court has never measured the effects of Google's supposed unlawful conduct, then this Court cannot evaluate the soundness of a factual finding that was never made. Nor can this Court assess whether the district court's remedies—which compel Google to give every potential competitor

resources superior to anything they could have developed on their own—are "tailored" or "proportional" to a finding about effects that was never made.

The district court's findings do not even support a conclusion that Google's challenged conduct had *any concrete effect at all*, especially given evidence that browser-makers would have chosen Google regardless.  When the court drew a causal connection between Google's supposed unlawful conduct and its leading market position, it did not apply the "stricter remedies causation standard—that was not the task at hand," but rather used the "'edentulous' causation standard at the liability stage."  JA__[Remedies.Op.75]*; *see* JA__[Liability.Op.216]* (liability-stage observation that "causation does not require but-for proof").  Thus, the district court's decisions—by their own terms—establish only by "more than the barest of inferences," JA__[Remedies.Op.81]*, the point that "Google's…contracts reasonably appear capable of significantly contributing to maintaining Google's monopoly power," JA__[Liability.Op.75]*.  No amount of "confidence" in a general *inference* that conduct was *capable* of affecting a market can substitute for a *finding* that conduct *in fact did so*—much less the degree to which it did so.  That kind of remedial overreach runs headlong into the Supreme Court's warning that "[c]ourts reviewing complex business arrangements should…be wary about invitations to set sail on a sea of doubt."  *Alston*, 594 U.S. at 107 (citation modified).

Thus, because the district court made no findings sufficient to justify them, the data-transfer and syndication remedies must be reversed.

### C. Even If Data-Transfer and Syndication Were Proper Remedies, No Legal Basis Existed for Extending Them to Companies Offering GenAI Products

Even if the district court did everything else correctly, it committed an obvious and serious error in forcing Google to aid companies that offer GenAI products but do not offer (or seek to offer) a GSE. That portion of the injunction remedies nothing; it is pure prospective regulatory policymaking in a new and vibrant market, untethered to any liability determination.

**1.** This Court's precedent required the district court to assess "whether a provision" requiring forced sharing with GenAI companies "could be linked to" its "liability" decision regarding the GSE market. *Massachusetts*, 373 F.3d at 1226.

Yet the district court never found that GenAI products had anything to do with either Google's conduct or its maintenance of monopoly power. Nor could it: GenAI products did not exist when this suit was brought—let alone at the time of Google's challenged conduct. The court did not find that they were part of the GSE market in which the court held that Google had monopoly power. Nobody claims Google has ever had (or threatened to have) a monopoly over GenAI products. To the contrary, the court found that the GenAI space was "highly competitive," with "numerous new market entrants" and "constant jockeying" for

the lead in quality.  JA__[Remedies.Op.40-41]*.  And GenAI products from companies other than Google are wildly successful; the court did not find that Google had any "distinct advantage" among GenAI products, and a leading competitor, OpenAI reported a market share of approximately 85%. JA__[Remedies.Op.41-42]*.

Any one of those facts should have ended consideration of forcing Google to provide GenAI companies with benefits.

**2.**     The district court reached its contrary decision by misreading *Microsoft* to freely authorize data-transfer and other benefits for makers of products outside the relevant antitrust product market.  JA__[Remedies.Op.59-60, 61, 65-66]*.  But *Microsoft* does not sweep so broadly.

The *Microsoft* plaintiffs' theory was that aiding browsers (or other kinds of "middleware") *outside* of the operating-systems market would help create conditions in which rival operating systems could compete with Microsoft Windows *inside* that market.  253 F.3d at 59-60.  The link to restoring competition inside the market that Microsoft had monopolized was a critical limitation on the remedy's reach:  The *Microsoft* district court ordered Microsoft to aid products "resembl[ing] the more traditional middleware that was the focus of liability" but refused to order such aid to products that were not "similar" to that kind of middleware.  *New York* v. *Microsoft Corp.*, 224 F. Supp. 2d 76, 128-29 (D.D.C.

2002).  This Court affirmed that remedial approach.  *See Massachusetts*, 373 F.3d at 1233.

Here, in contrast, Plaintiffs' theory has never been, and the district court never found, that Google had blocked GenAI products outside the GSE market that could have helped other GSEs compete inside the GSE market.  Even if "GenAI products have [since] emerged as a competitive threat to the traditional GSE," JA__[Remedies.Op.106-07]*, turbocharging outside-the-market GenAI products was a remedy unrelated to any wrong found at the liability stage.  This case is thus nothing like *Microsoft*.

**3.**     With no evidence of harm to competition among GenAI products and no finding that GenAI products compete within the supposed GSE market, forced sharing with GenAI competitors could not be "tailored to fit the wrong creating the occasion for the remedy."  *Microsoft*, 253 F.3d at 107.  And that overreach needlessly inserts the courts into "these fast-moving times, where GenAI technologies are breaking barriers seemingly at light speed." JA__[Remedies.Op.220]*.  Judicial intervention in one of the most dynamic and competitive technologies in history disserves antitrust law's goal of allowing free competition to shape new markets.

Judges "are neither economic nor industry experts" and "must have a healthy respect for the practical limits of judicial administration:  An antitrust court is

- 97 -

unlikely to be an effective day-to-day enforcer of a detailed decree, able to keep pace with changing market dynamics alongside a busy docket." *Alston*, 594 U.S. at 102-03 (citation modified).  Courts make for poor "central planners and should never aspire to the role" because "the continuing supervision of a highly detailed decree could wind up impairing rather than enhancing competition." *Id.* at 102-03 (citations modified).  The district court's failure to exercise its discretion consistent with those principles is a further reason that its remedies should not be extended to GenAI companies that do not offer a GSE.

## CONCLUSION

The district court's judgment should be reversed.

May 22, 2026                                    Respectfully submitted,

                                                /s/ Donald B. Verrilli, Jr.
Benjamin J. Horwich                             Donald B. Verrilli, Jr.
Justin P. Raphael                               Helen E. White
MUNGER, TOLLES & OLSON LLP                      Kyle A. Schneider
560 Mission Street, 27th Floor                  MUNGER, TOLLES & OLSON LLP
San Francisco, CA 94105                         601 Massachusetts Ave. NW
(415) 512-4000                                   Suite 500E
                                                Washington, DC 20001
John E. Schmidtlein                             (202) 220-1100
Graham W. Safty                                 Donald.Verrilli@mto.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW                            Mark S. Popofsky
Washington, DC 20024                            ROPES & GRAY LLP
(202) 434-5000                                  2099 Pennsylvania Avenue, NW
                                                Washington, DC 20006
                                                (202) 508-4624

*Counsel for Appellant-Cross-Appellee Google LLC*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of this Court's order of April 30, 2026.  As measured by the word-processing system used to prepare this brief, there are 20,787 words in the brief excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1).

Dated:  May 22, 2026

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.